THE PEOPLE ex rel. Moloney, Attorney General,

v.

THE GENERAL ELECTRIC RAILWAY COMPANY et al.

*Opinion filed April 21, 1898.*

1. INJUNCTION—*injunction will not be granted as a remedy for mere consequential damages.* Where damages are merely consequential equity will not interfere by injunction, as a court of law is the proper tribunal for a determination of that question.

2. SAME—*private parties cannot enjoin construction of street railroad.* Neither a private individual nor a private corporation can invoke the aid of a court of equity to prevent, by injunction, the construction of a street railroad.

3. SAME—*what cannot be done directly cannot be done indirectly.* One who cannot maintain a bill for an injunction in his private capacity will not be allowed to accomplish his purpose indirectly by an information in chancery in the name of the Attorney General of the State.

4. SAME—*equity may inquire who are the real parties to a proceeding for an injunction.* Equity may go behind the nominal parties to the record in a proceeding for an injunction, though the same is instituted and carried on in the name of the People, on the relation of the Attorney General, to discover the real parties in interest.

5. SAME—*when information in chancery for injunction should be dismissed.* An information in chancery brought in the name of the People, by the Attorney General, to prevent, by injunction, the construction of a street railroad, should be dismissed where it appears that no public rights are involved, and that the real parties in interest are rival railroad companies whose interests would alone be subserved by granting the injunction.

CARTWRIGHT, J., dissenting.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. E. F. DUNNE, Judge, presiding.

This case was commenced by a bill or information in the name of the People of the State, filed in the circuit court of Cook county on the 9th day of March, 1896, against the General Electric Railway Company, the city of Chicago, George B. Swift, mayor of that city, and William D. Kent, commissioner of public works. This

172—9

information attacked the right of the General Electric
Railway Company to construct an electric street railroad
in certain streets in the city of Chicago, upon the ground
that the ordinance of the city council consenting to the
construction of such railway, and passed on the 13th day
of January, 1896, was void.    This ordinance is set out
*in extenso*, and its invalidity is asserted in the bill or in-
formation on these grounds:

*First*—That no valid or sufficient petition for the
granting of consent to the railway company was pre-
sented to the city council prior to the passage of the
ordinance, and that no published notice of the time and
place of presenting the petition to the city council was
given by publication in any newspaper published in the
city of Chicago, at least ten days prior thereto, as re-
quired by the statute of the State relating to horse and
dummy railroads.

*Second*—That the General Electric Railway Company,
contriving to deceive the city council and to induce its
members to believe that the owners of property fronting
upon portions of the streets described in the ordinance
were consenting thereto, unlawfully, corruptly and fraud-
ulently procured and presented to the city council instru-
ments in writing purporting to be petitions or consents
of the owners of certain lots and parcels of land fronting
upon the portions of the streets, respectively, mentioned
in section 1 of the said ordinance, which petitions were,
by the procurement and fraud of the railway company,
signed by persons owning no property fronting upon any
portions of said streets yet pretending to be the owners
of certain of such property; that names of certain own-
ers of such property were falsely and corruptly forged
to the petition; that signatures of certain owners were
attached by other persons wholly unauthorized, and that
the signatures of certain owners of property fronting
upon said streets were, by said railway company, fraud-
ulently and unlawfully purchased for a valuable consid-

eration,—all which was done with the corrupt and illegal purpose of inducing the council to believe that the owners had voluntarily consented, in writing, to the granting of such consent.

Appended to the information were copies of all pretended consents or petitions to the council, as is alleged in the bill, and they were made a part of the amended bill or information which was filed on the 24th of April, 1896, and on which the case below, together with certain affidavits and the answer of the defendants, was heard. It is also alleged that in no case was there presented to the city council, prior to the passage of the ordinance, the consents of the owners of more than half the property fronting upon either of the portions of the streets referred to in the ordinance, but, on the contrary, as to all except a portion of Fifty-seventh, Morgan and Fifty-sixth streets, the city council passed the ordinance without having had, prior to the passage thereof, petitions or consents of the owners of the land representing more than one-half the frontage of the portions of streets sought to be used for such street railway, or of either of them. There follows then, in the amended bill or information, a tabulation of each mile and fractional mile proposed to be used by the railway company, giving the total lot frontage in each mile and fractional mile, the frontage represented upon the petition, the frontage improperly signed for, either by forgery, purchased consents or otherwise, and also frontage consents which were revoked by the owners prior to the passage of the ordinance; and appended to the original information were exhibits referred to in the amended information, and made a part thereof, consisting of copies of consents to the granting of the ordinance in question.   These are not printed in full in the abstract, but certain of them are printed to indicate their general character.   It is also alleged in the bill that the city of Chicago has been since April 23, 1875, a municipal corporation, organized and existing under the City,

Town and Village act, approved April 10, 1872, and that among the public highways of the city are the streets sought to be occupied, in whole or in part, by the railway company. The bill also recited certain statutory provisions touching upon this subject, as follows:

"That by virtue of said act of April 10, 1872, and its amendments, and of other laws of said State, the city council of said city was and is vested with power and authority to regulate and control the use of the public streets and highways within the limits of the said city, subject, however, to the following limitations and conditions, the observance of which have ever since been and are prerequisite to its lawful exercise of such power and authority, to-wit:

"*First*—That no horse or dummy railroad or tramway can be lawfully located upon or along any street or over any public ground in any incorporated city without the consent of the corporate authorities of such city duly granted in the manner prescribed by law, and such consent cannot be granted (*a*) for a longer period than twenty years, (*b*) nor unless at least ten days' public notice of the time and place of the presenting to said city council of a petition for such consent shall have been given by publication in some newspaper published in the city or county in which such road is to be constructed, (*c*) nor except upon the condition that the company proposing to use such streets for said purpose will pay all damages to owners of property abutting upon such streets or public grounds upon or over which such road is to be constructed, which such owners may sustain by reason of the location or construction of said road, the same to be ascertained in the manner provided by law for the exercise of the right of eminent domain.

"*Second*—That the city council of said city had and has 'no power to grant the use of or the right to lay down any railroad tracks in any street of said city to any steam, dummy, electric, cable, horse or other railroad company,

\*   \*   \*   except upon the petition of the owners of the land representing more than one-half of the frontage of the street, or so much thereof as is sought to be used for railroad purposes; and when the street or part thereof sought to be used shall be more than one mile in extent no petition of land owners shall be valid unless the same shall be signed by the owners of the land representing more than one-half of the frontage of each mile, and of the fraction of a mile, if any, in excess of the whole mile, measuring from the initial point named in such petition of such street or of the part thereof sought to be used for railroad purposes.'"

The invalidity of the ordinance is not in the bill directly attacked for its failure to contain the condition referred to in clause (c) just quoted, that the company proposing to use such streets shall pay all damages to owners of abutting property thereon.   The bill attacks the authority of the General Electric Railway Company to build a street railroad, upon the ground that its capacity and authority are expressly limited to the objects stated in paragraph 2 of its articles of incorporation, which are as follows: "To making, acquiring, owning, using, managing, selling and otherwise handling or disposing of inventions, improvements and patents in railway appliances and devices, and the models, patterns and samples thereof, and to acquire and operate street railways."

Appended to the amended information or bill are schedules containing the particulars of the general charges made in the bill as to deficiency of frontage signatures. It will not, probably, be necessary to examine these schedules in view of the state of the record in this case.

The bill sought an injunction against the railway company to prevent it from constructing its railway on the streets mentioned in the ordinance, except Fifty-sixth, Fifty-seventh and Morgan streets, and also to restrain the city and its officers from granting a permit, and the

bill also prayed that the ordinance might be declared null and void, and for general relief. Summaries of each schedule are printed in the abstract, and show a shortage in necessary frontage consents, and explain the deductions made from the frontage appearing on the face of the petition to be signed for, with the reasons for such deductions.

The case, on the 27th of April, 1896, was by agreement transferred to the docket of Judge Dunne, and on the same day the General Electric Railway Company filed its answer, in which it was, among other things, charged that the bill was filed for the sole benefit of the Chicago City Railway Company, which had a monopoly of the street railroad traffic on the south side of the city of Chicago, and that one Darrow, who appeared of counsel upon the face of the bill, was not employed by the State nor by the Attorney General, but was the attorney of the City Railway Company, and that certain persons making affidavits of verification of the bill were employees of the City Railway Company, and that the agents of the City Railway Company were constantly soliciting property owners who signed petitions in favor of the Electric Railway Company to revoke their signatures, and made certain false representations in regard thereto; alleged that the General Electric Railway Company was neither a horse nor dummy railroad, and its intention to construct an underground system of street railway, and that therefore the provision as to ten days' notice by publication of the time and place of presenting a petition to the city council does not apply to the defendant railway company; admits that the purposes of its incorporation, under its original charter, are correctly set out in the bill, but denies that thereunder it had no power or capacity to construct a street railroad in the city of Chicago, and alleges that thereafter the objects of the incorporation of the General Electric Railway Company were changed and broadened, so as to embrace the building and con-

struction of street railways; denies that the passage of
the ordinance was obtained fraudulently and in an un-
lawful manner and by illegal means; denies that no peti-
tion therefor was presented to the city council prior to
the passage thereof, and also alleges that the General
Electric Railway Company did publish notice in accord-
ance with the Horse and Dummy act; denies that the
General Electric Railway Company fraudulently procured
and presented to the city council instruments in writing
pretending to be petitions of the owners of lots fronting
on streets in question; denies that such petitions were
procured by fraud and signed by persons owning no prop-
erty fronting on any portion of said streets; denies that
the names of any owners of property on said streets were
falsely and corruptly forged to said petition; that the
signatures of certain owners were attached thereto by
unauthorized persons; that any signatures were fraudu-
lently and unlawfully purchased by the General Electric
Railway Company; denies that in no case was there pre-
sented to the city council, prior to the passage of the
ordinance, the consents of the owners of more than one-
half the frontage required by law, but alleges, on the
contrary, that more than one-half the frontage in each
and every mile of each street named in the ordinance was
presented in petitions before the council; states that all
the revocations of consents were purchased by the City
Railway Company, or obtained by false and fraudulent
representations; denies any fraud in regard to this mat-
ter by the Electric Railway Company; sets out the report
of the commissioner of public works of the city as to
the frontage represented by the petitions, and represents
that at the council meeting, January 9, 1896, a large num-
ber of additional petitions, representing frontage on the
respective streets of over four thousand feet, were pre-
sented to the city council by one of the aldermen, and
that the city council considered the petitions referred
to in the report of the commissioner of public works,

together with additional petitions so presented at that meeting, and found and determined that such petitions represented and contained the petition of the owners of the land representing more than one-half of the frontage of each of the streets named in the ordinance, or so much thereof as was sought by the respondent to be used for railroad purposes, and that the ordinance was at that meeting duly and legally passed, but vetoed afterwards by the mayor, and on January 13, 1896, finally passed by the city council over the veto; alleges that much of the property along the streets designated in the ordinance is railroad property, the right of way of one or more steam railroad companies, and in actual use as such. In the commencement of this answer the General Electric Railway Company seeks to preserve all right of exception to the bill as if demurred to.

On May 1, 1896, the defendant railway company filed what purported to be an amendment to its answer to the amended bill and information. The only answer theretofore filed by the defendant purported to be an answer to the original bill and information. That amendment, omitting the caption and signature, is as follows: "And now comes the defendant, by leave of court first had and obtained, and amends its answer to the amended bill heretofore filed in said cause, by adding thereto the following allegation or statement, to-wit: This defendant, further answering, says that on the 7th day of March, A. D. 1896, a petition for *mandamus* was filed in the circuit court of Cook county, in the name of the People, on the relation of this defendant, against George B. Swift, mayor of the city of Chicago, (a copy of which petition is hereto attached and marked exhibit 'A,' and made a part of this answer.) This defendant, further answering, says that thereafter, on the same 7th day of March, 1896, there was filed in said circuit court a demurrer to said petition for a *mandamus*, (a copy of which said demurrer is hereto attached and marked exhibit 'B,' and made a part of this

answer.)   This defendant, further answering, says that
on the said 7th day of March, A. D. 1896, a judgment was
entered in said circuit court in the suit which was begun
by said petition for a *mandamus*, (a copy of which said
judgment is hereto attached and marked exhibit 'C,' and
hereby made a part of this answer.)"   Appended to said
amendment is an affidavit of verification by the president
of the defendant railway company.

Attached to said amendment as exhibit "A" is what
purports to be a copy of a petition of the General Elec-
tric Railway Company for a writ of *mandamus* addressed
to the judges of the circuit court of Cook county, and en-
titled:   "The People of the State of Illinois, *ex rel.* Gen-
eral Electric Railway Company *v.* George B. Swift, Mayor
of the City of Chicago."   The petition alleges that the
petitioner is an Illinois corporation organized for the pur-
pose, among other things, of constructing and operating
street railways; that an ordinance was passed by the city
council authorizing the relator to construct a street rail-
road, etc.; that at the next regular meeting of said coun-
cil the mayor of said city returned said ordinance to said
council with his objections thereto in writing.   The peti-
tion then sets out the mayor's veto message, and alleges
that upon the return of the said ordinance by the mayor,
with his objections thereto, the council duly passed the
ordinance over said veto; that on March 5, 1896, the peti-
tioner caused to be tendered and presented to said Swift,
as such mayor, a good and sufficient bond, in the penal
sum of $100,000, conditioned as provided in the ordinance,
with good and sufficient sureties, and then and there
requested said mayor to approve said sureties, and said
mayor then stated that said bond appeared to be in due
form and the sureties to be persons of ample financial
responsibility, but refused to approve said sureties, and
stated that his reason for so doing was that said ordi-
nance had not been legally passed, and petitioner prays
a writ of *mandamus* to compel said mayor to approve said

bond. The petition was sworn to by the secretary of the petitioner.

Attached to said amendment as exhibit "B" is a copy of a general demurrer of the mayor to the petition for a *mandamus;* and also, as exhibit "C," what purports to be an order of the circuit court overruling said demurrer, in which it is recited that said mayor elects to stand by his demurrer, and that said petition is taken as confessed, and that a peremptory writ of *mandamus* be issued by the clerk as prayed for in the petition.

The unverified answer of the city of Chicago and of William D. Kent, commissioner of public works, to the amended bill and information, alleges that the city council, on January 13, 1896, passed the ordinance, a copy of which is attached to the amended bill and information, but denies that it was passed without the necessary consents of the property owners; that the council, acting in a *quasi* judicial capacity, considered said consents and found and determined that the same were sufficient, and that said council was duly authorized and empowered to pass the ordinance. It neither admits nor denies the other allegations of the information, and calls for proof thereof.

Replications to both answers were filed May 14, 1896, and on May 25 the following final order or decree was entered: "This cause coming on to be heard upon the motion of the complainant for a preliminary injunction, according to the prayer of the amended bill and information, and on the motion of the defendant, the General Electric Railway Company, to dismiss the amended bill and information, and the matter having been heard on the amended bill and information, affidavits 'and documentary evidence in support thereof, and on the answers and amended answer and the affidavits and documentary evidence offered by defendant, the General Electric Railway Company, and the court, by agreement of the parties, having taken a view of the streets and abutting

property on Plymouth place, Custom House place and Dearborn street, between Polk street and Twenty-second street, in the city of Chicago, being part of the streets in which the defendant, the General Electric Railway Company, claims the right to build its road, as set out in the bill of complaint, and the parties being present in court by their respective solicitors, and the court, having heard the arguments of counsel and being fully advised in the premises, doth adjudge and decree that said motion for an injunction be and the same is denied, and that the said bill of complaint be and the same is hereby dismissed for want of equity. It is further found and declared by the court that this cause has been by the filing heretofore of complainant's replications to the answers of defendants placed at issue, but that no trial or hearing was had of the issues so joined; that only the two motions herein set forth were before the court for consideration and determination, and that is all that is hereby disposed of by the court, and that there was no hearing of said cause other than a disposition of said motions, and said bill and information is dismissed for want of equity, as aforesaid. Thereupon the complainants, by their solicitors, pray an appeal to the Appellate Court for the First District, whereupon, on motion of said complainant's solicitor, it is ordered that said motion for appeal be and hereby is entered and continued to June 1, 1896." The city of Chicago thereafter asked leave to withdraw its answer, which was overruled *nunc pro tunc* as of May 25, 1896. Complainant prayed an appeal to the Appellate Court for the First District, which on the first day of June, 1896, was allowed.

Numerous affidavits being filed in support of the bill, and also in support of the answer of the defendant railway company, the motion of the complainant for a preliminary injunction came on to be heard in the circuit court, and thereupon the defendant company, in argument, moved to dismiss the bill, and, as appears by the

decree of the court already quoted, that was the order and judgment of the court in the case.

The affidavits offered by the People were mainly directed to establishing the charge that a large number of signatures to the pretended frontage petitions were forged, the affidavits of upwards of one hundred property owners to that effect appearing in the record. Counter affidavits were filed by the railway company.

M. T. MOLONEY, Attorney General, (DARROW, THOMAS & THOMPSON, S. P. SHOPE, HAMLINE, SCOTT & LORD, and JOHN H. HAMLINE, of counsel,) for plaintiff in error.

WALKER, JUDD & HAWLEY, (THOMAS A. MORAN, CHARLES A. DUPEE, and RICHARD PRENDERGAST, of counsel,) for defendants in error.

Mr. CHIEF JUSTICE PHILLIPS delivered the opinion of the court:

Numerous points are argued by counsel as to the right of the relator to an injunction; as to dismissing the bill before final hearing; as to the insufficiency of the ordinance because of the insufficiency of the petition or the consent of abutting owners; that an unauthorized use of a public highway by a street railway company is a nuisance *per se*, and may be enjoined by the public authorities without proof of further public injury; that equity has jurisdiction to enjoin acts in excess of corporate charter powers, at the suit of the State, upon the sole ground that they are unlawful; that the judgment in the *mandamus* proceeding against the mayor was not an adjudication which would estop or bar this proceeding by the State; that the ordinance is void for non-compliance with the Horse and Dummy act; that the consenting property owners are trustees to their fellow abutting owners and the public, and the purchased consents are a fraud on·the city council, the public and abutting own-

ers, and are void and cannot be counted; and that the bill should not be dismissed because attorneys of abutting lot owners assisted the Attorney General in the trial of the cause.

In response to these numerous points made by plaintiff in error the defendants in error say: "Our position in the court below was, and in this court is, that this information, though filed in form by the Attorney General in behalf of the People of the State of Illinois, yet was not filed for the purpose of asserting any public right or protecting any public interest in the streets covered by appellee's ordinance, but was in reality filed at the instance and by the procurement of rival railway companies, some of whom are in substantial but unauthorized possession of portions of the streets, and one of them in possession of a monopoly of the territory in which the appellee company proposes to build its street railway line for passenger railway purposes, and that if the court below believed, from the evidence and from his inspection of the premises, that the bill was not prosecuted in behalf of or for the interests of the public, but was in fact prosecuted in the interests of such rival railway companies, it became his duty to dismiss the bill." This position of the defendants in error renders unnecessary a discussion of any other point than whether or not it was error to dismiss this bill before final hearing if it was not prosecuted solely in behalf of and for the interests of the public, but in the interests of rival companies.

It is urged by the plaintiff in error, that where a bill is filed by the Attorney General which alleges a public nuisance is about to be placed in a street, the only question is one of fact; that he does not have to prove any damage, but only show an invasion of rights of the public; that a property owner, on the contrary, must show a special damage different from that sustained by the public; and that when the chancellor is of opinion that there is no damage to the abutting owners' lots, and the

bill is filed merely as a cloak for an attempt on the part of a rival company to keep another out of its territory, the chancellor may, in the latter case, dismiss the bill, but cannot do so if it is filed by the Attorney General.

In *Doane* v. *Lake Street Elevated Railroad Co.* 165 Ill. 510, we held an abutting lot owner had no right to invoke the aid of a court of equity to prevent the construction of a street railroad, and in that case it was said (p. 519): "The real ground upon which relief by injunction is denied in such cases is, that the use of the street being within the purposes for which it is laid out, and therefore a proper use, the right to occupy is properly a question between the defendant and the municipality having the control of its streets and charged with the duty of keeping them free from unlawful obstructions, or between the defendant and the public generally, the individual being left to his action for damages for any injury resulting to his property. He has no standing in equity on account of public injury or for the purpose of inflicting punishment upon the defendant for its wrongful acts. He can only invoke that jurisdiction in order to protect his property from threatened injury. His injury is a depreciation of the property which is capable of being estimated in money and recoverable in an action at law, therefore a court of equity will not interfere by injunction."

Where injuries are consequential, merely, a court of equity is not the proper jurisdiction to enforce a remedy, as a court of law is the proper tribunal for the determination of such questions between individuals and corporations, or between corporations. That which cannot be done directly cannot be done by indirection, and if the information in this proceeding is invoked by rival corporations to prevent the construction of this road, it is an indirect method of procuring an injunction, such as was held in the *Doane case* could not be sustained. To determine whether the proceeding is improperly invoked, a court of equity may go behind the parties on the face of

the record, to see who are the real parties prosecuting the proceeding,—and this may be done even where the proceeding is in the name of the Attorney General. If the proceeding is prosecuted and carried on for the exclusive benefit of an individual or corporation, the court may order an information in such case to be dismissed.

In *New Hampshire* v. *Louisiana,* and *New York* v. *Louisiana,* 108 U. S. 76, the Supreme Court of the United States looked behind and through the nominal parties, though the nominal party was the Attorney General, to ascertain who were the real parties to the suit. Chief Justice Waite, in his opinion, said: "No one can look at the pleadings and testimony in these cases without being satisfied, beyond all doubt, that they were, in legal effect, commenced and are now prosecuted solely by the owners of the bonds and coupons. * * * The bill, although signed by the Attorney General, is also signed and was originally drawn by the same counsel who prosecuted the suits for the bondholders in Louisiana, and it is manifested in many ways that both the State and the Attorney General are only nominal actors in the proceeding. The bond owner, whoever he may be, was the promoter and is the manager of the suits, and while the suits are in the names of the States, they are under the actual control of individual citizens, and are prosecuted and carried on altogether by and for them." The court ordered the bill so signed by the Attorney General dismissed.

In *United States* v. *Beebe,* 127 U. S. 338, while the court asserted the undoubted authority of the Attorney General, under the constitution and laws of the United States, to institute a suit in the name of the United States to set aside a patent alleged to have been obtained by fraud, it yet held that the court would examine as to whether such suit was brought for the United States in fact or to enforce the private right of a private party. The court said: "It has been not unusual for this court, for the purposes of justice, to determine the real parties to the

suit by reference not merely to the names in which it is brought, but to the facts of the case as they appear on the record." Again, on page 346, after citing many cases to demonstrate the practice of the court in going behind the nominal parties to see who the real parties were, the court said: "Applying this principle to this case, an inspection of the record shows that the government, though in name the complainant, is not the real contestant party to the title or property in the land in controversy. It has no interest in the suit, and has nothing to gain from the relief prayed for and nothing to lose if the relief is denied. The bill itself was filed in the name of the United States, and signed by the Attorney General on the petition of a private individual, and the right asserted is a private right." And on page 347 it said: "We are of the opinion that when the government is a mere formal complainant in a suit, not for the purpose of asserting any public right or protecting any public interest, title or property, but merely to form a conduit through which one private person can conduct litigation against another private person, a court of equity will not be restrained from administering the equities existing between the real parties by any exemption of the government designed for the protection of the United States alone." The action of the lower court in dismissing the bill was affirmed.

The same position was announced by the Court of Chancery in England in cases involving the very question of a nuisance on the public streets. In the case of *Attorney General* v. *Sheffield Gas Consumers' Co.* 3 DeG., M. & G. 304, it was held that where the Attorney General and the public were mere fictions, and not the real parties concerned, the information should be dismissed. To the same effect is the case of *Attorney General* v. *Cambridge Consumers' Gas Co.* 4 L. R. Ch. App. 71.

On principle it cannot be held that where a private individual cannot maintain a bill for injunction in his own name he may do so in the name of the Attorney Gen-

eral, on an information in equity; but it is urged the court erred in assuming to decide, from mere *ex parte* affidavits, that the suit was only colorable in behalf of the public, and that the real purpose of thus styling the complaint' or information was to enable certain street railroad companies,—rivals in business of the defendant company,— to employ the process and functions of the court in aid of the selfish and private ends of such companies. We need not pause to determine whether such a question may be determined in an incidental or interlocutory way and upon mere *ex parte* affidavits of affiants whom the adverse party had no opportunity of cross-examining, for the reason we think it appears, from the record, proof other than affidavits was produced, and that the parties voluntarily submitted the question to the court to be decided upon the facts and circumstances developed upon the hearing of the motion. We find from the record the parties, on the hearing of the motion, joined in laying before the court affidavits *pro et con*, and in rebuttal printed reports of the proceedings of the city council of the city of Chicago, and a printed copy of a message of the mayor of the city, and copies of other documents and photographs of still other documents, and finally voluntarily agreed the judge before whom the motion was pending should visit and inspect Plymouth place, Custom House place and Dearborn street, from Polk street to Twenty-second street, and the property abutting thereon. In pursuance of this agreement the trial judge did view and examine such places, street and property. The purpose to be attained by a personal inspection on the part of the judge was to bring in for consideration, in passing upon the motion, such facts as should thus come to the knowledge of the court. We expressly ruled in *Culbertson & Blair Provision Co.* v. *City of Chicago*, 111 Ill. 651, that where, by mutual consent of the parties, the jury were allowed to view the premises, such facts as they learned by so viewing the property, bearing upon the issue involved,

were proper for consideration in arriving at a verdict. The chancellor in the case at bar understood, and was, we think, warranted in coming to the conclusion, that the parties had submitted the motion to dismiss the bill to him for final decision upon the facts and circumstances brought to his knowledge by the various means employed for that purpose. Acting upon such well-justified belief, the court considered and determined the motion, and, adjudging the ground to be well sustained, dismissed the bill. If the name of the People as complainant in the bill or information was being used for the collusive purpose of concealing the true instigators of the litigation, and to enable them to falsely and unlawfully invoke and employ the powers and functions of the court, it is undeniable it was the province and duty of the court to strike the cause from the docket.

Whether, then, this information was filed for the protection of the public or said other corporations is the material question here, and from an examination of this record we concur in the opinion of the learned chancellor who heard this case, where he holds, in substance: "In the case at bar, where the proceedings are brought in the name of the Attorney General, and while, presumptively, the rights of the People are involved, the facts and circumstances have impressed this court with the conviction that the real parties in interest and the real parties who would suffer by the building of the road in question are not the People of the State of Illinois, but two rival corporations doing a similar business in the same sections of the city, whose interests would be imperiled by the building of this road. * * * The Western Indiana Railroad Company and its lessees do all the immense freight and passenger business of this road and of several lessee roads in the city of Chicago, between Polk street and Fourteenth street. Between these streets Plymouth court and Custom House place are practically in the possession and under the control of these roads, and the amount of

business done is so enormous that the use of either of these streets by a street railway would undoubtedly inconvenience the Chicago and Western Indiana Railroad Company and all of its lessees. The occupation of these streets by a street railway between Polk and Fourteenth streets would make the transaction of the business of these roads much more difficult than at present. It is not to be wondered at that this road should retain counsel, as Mr. Hamline admits it has, to assist the Attorney General in this case. Almost the whole of the street railway traffic of the south side of the city of Chicago is at present conducted by the Chicago City Railway Company. With the exception of Michigan avenue, every street of any length running north and south, leading from the suburbs to the heart of the city, excepting the streets proposed to be occupied by the General Electric Railway Company, are now occupied by the street railways of the Chicago City Railway Company. Every passenger living in the south division of the city of Chicago and desiring to come to the heart of the city upon a street railway must take one of the cars of this company. If the new road be opened up, as contemplated in the ordinance in question, it will compel the Chicago City Railway Company to divide its passenger traffic with the new road. Thus the interests of the said City Railway Company are seriously imperiled. It is not to be wondered at, then, that this record discloses, by numerous affidavits, that the Chicago City Railway Company has procured revocations, purchased or otherwise, from property owners living along the line of the proposed road. Nor is it to be wondered at that able and eminent counsel has appeared in this court to assist the Attorney General, who meets with silence the charge made in open court that he is being paid for his professional services by this company. Without doubt the interests of both the Chicago City Railway Company and the Chicago and Western Indiana Railroad Company and its lessee roads, some of whom carry on a suburban

passenger service, would be imperiled by the building of the General Electric Railway Company. During the long arguments before this court it was not made to appear to the court that any other property owner or citizen, save and except these companies, would suffer any injury from the building of this road. These considerations have been forced upon the court during the arguments, and that they are proper to be taken into account is shown by the language of other courts in passing upon like cases."

From the evidence in this record we cannot escape the conclusion that the inception of this information, its progress in the court below and what has been done here are in the interest of these rival companies. This information does not appear to have been filed to preserve a public right or benefit. It is, if sustained, preventive of a healthy competition in the interest of the people resident in that part of the territory of Chicago where the road is proposed to be constructed. It is to the advantage only of the corporations, which the chancellor found were the only parties in interest aiding in this proceeding. The complaint made on this information is not for the public welfare. No public good is here involved. No public policy is subserved by the filing of this information, if it rests alone on the complaint of two rival corporations, which we are constrained to find, from the evidence in this record, it alone rests upon.

From the entire record and proceedings we are of opinion the chancellor who heard this case properly dismissed the information. The decree is affirmed.

*Decree affirmed.*

Mr. JUSTICE CARTWRIGHT, dissenting.