## CITY OF ROCK ISLAND ET AL.

### v.

## AUGUST HUESING.

*Municipal Corporations—Police Powers—Abattoir or Public Slaughtering House—Illegal Tax—Injunction—Parties—Estoppel.*

1. The City of Rock Island has the power, under the general act for the incorporation of cities and villages, to establish and maintain an abattoir or public slaughtering house for the purpose of securing proper inspection of fresh meats furnished to the inhabitants of the city.

2. An injunction will lie to enjoin a tax which has been imposed without authority.

3. A bill for an injunction to enjoin the levy and collection of an unauthorized tax or an illegal appropriation of its funds by a municipal corporation, may be maintained by any taxpayer, however small the amount he is required to pay and whatever may be his private motives.

4. The payment of one illegal tax can not be invoked as an estoppel against a taxpayer who seeks to enjoin another levied on the same or similar account.

[Opinion filed January 7, 1888.]

APPEAL from the Circuit Court of Rock Island; the Hon. JOHN J. GLENN, Judge, presiding.

This was a bill in equity brought by the appellee, a resident and taxpayer of the City of Rock Island, praying to have it enjoined from maintaining, managing and controlling an abattoir, or public slaughtering house, within the city limits, and from passing any ordinance or making any contract for such purpose, and from appropriating or expending any of the money of the said city for such purpose, or for hire, wages or salary of a deputy health commissioner, or other person, for superintending or managing said abattoir; or from making any allowance or appropriation of money for any cost or expenses of said abattoir, or for the purpose of payment for fixtures, appliances or things put into, or to be put into or furnished about said abattoir, by John Valk or any other person; and also praying that the Mayor of the city and Clerk may be enjoined and restrained from embracing or including in any certificate of said city, or any of its officers or authorities, to the County Clerk of said Rock Island County, of the amount which said city may require to be raised by taxation, the sum of $3,000, appropriated by said City Council of said city in and for the year 1886, for abattoir purposes; or the sum of $600 appropriated by the said City Council in and for the said year for hire, wages or salary of a deputy health commissioner in charge and management of said abattoir, or for any costs and expenses of managing the same, and from signing or issuing any orders for the payment of any appropriation of any money for any costs or expenses of the abattoir, or of maintaining or managing the same, etc.

A temporary injunction was granted, and upon a final hearing upon answer and evidence the injunction was made perpetual and costs awarded against the said city, from which order and decree this appeal is taken.

It appears from the bill, answer and evidence introduced, that the appellant became duly organized under the general

laws of the State of Illinois, entitled "An act to provide for the incorporation of cities and villages," approved April 10, 1872, and the various amendments thereto, on the 4th day of November, 1879, the city having changed from its organization under its special charter of February 16, 1857, to its organization under the general law.

The city is situate on the southern and eastern banks of the Mississippi River, which form its northern and western boundaries, the city being about 3¼ miles east and west, and 1¼ north and south, exclusive of Rock Island, and containing about 12,000 inhabitants.

It appears that on the 3d day of July, 1885, one Bailey Davenport donated to said appellant two acres of land on the bank of the river on the south line of the city for an abattoir, with all riparian rights belonging to the land.

The City Council in the same year constructed a brick building, with stone basement, about 40 x 80 feet in size, on said ground, with cattle and hog bins attached, and other fixtures necessary for a slaughter house, and in readiness for the necessary appliances for slaughtering animals, which said building was paid for by the city, costing about $3,000. John Valk proposed to the city to furnish the necessary appliances for butchering for $2,585, and give the city the use of the fixtures and appliances free to July, 1886, and that the city might purchase the same at that sum, and in case the city did not purchase he was to remove the same. The city accepted the proposition, and entered on the use of the abattoir, and gave out that it would purchase the said appliances. The City Council, in May, 1886, passed a general appropriation ordinance, including $3,000 for abattoir purposes, and $600 for deputy health commissioner, for his salary for superintending the carrying on of this business of inspection and butchering.

The bill showed that the City Council was about to pass an amendatory ordinance (May, 1886,) requiring that all the cattle whose flesh was intended for sale in said city should be butchered at the abattoir.

It appears from the bill and is admitted by the answer that

City of Rock Island v. Huesing.

the city had, on the 7th of December, 1885, passed an ordinance, in force when the bill was filed, entitled "An ordinance to establish a city abattoir, and providing for the managing and use thereof." It declares, in Sec. 2, that "said abattoir is established and shall be maintained for the use and purpose of regulating the business of furnishing fresh meats to the inhabitants of said city and reasonably to secure to them good, fresh, wholesome meats."

Sec. 3 gives the health commissioner the custody and management of the same; requires him to keep it clean, etc., and requires him to see "that the rights and privileges of all persons entitled to use the same are allowed and given without distinction," and is authorized to employ deputies, whose compensation shall be fixed by the City Council."

Sec. 4 provides that "every person licensed under the ordinances of the city to sell fresh meats shall be entitled to use said abattoir upon compliance with the provisions, rules and regulations governing the use thereof."

Sec. 5 provides for the suspension of licensed persons from the use of the abattoir in case of violation of its rules, etc.

Sec. 6 provides for the times of keeping the same open for use, for inspection and slaughter of animals.

Sec. 7 provides that "Every person licensed under the ordinances of this city to sell fresh meats, of cattle, hogs, sheep, calves or lambs, shall, before offering such meats for sale, have the same inspected and approved by the commissioner of health or his deputy, at the city abattoir or any licensed packing-house or other place in said city licensed for the slaughter of animals, and it shall be the duty of said commissioner of health, in person or by deputy, to inspect meats at said places other than said abattoir, at all reasonable hours, and to as fully as possible meet the convenience of persons asking such inspection."

Sec. 8 fixes the price to be paid to the city for slaughtering each head of cattle at 25 cents, each head of sheep, etc., 10 cents, each head of hogs, etc., 15 cents, and calves at 10 cents.

Sec. 9 provides that all cattle, sheep, hogs and calves before slaughter shall be inspected at the abattoir, or any licensed

packing-house or other place in the city licensed for the slaughter of animals, and also the flesh of such animals, after slaughter, shall be inspected by the health commissioner or deputy at the same places.

Other sections make it unlawful to sell such meats in the city without the inspection provided for, and fix a penalty for its violation at not less than $5 nor more than $200, and provides for revocation of the butcher's license.

The answer sets up that the abattoir erected and the ordinance passed was for the purpose of protecting the people in their health, by procuring and furnishing them with clean and wholesome meats, and also to do away with the slaughter house nuisance, as it is c'aimed that it existed prior to the time of the passage of the ordinance and the building of the abattoir.   Shows the special conditions existing prior to the building of the abattoir; that the slaughtering of animals for furnishing meats to the said city was done in five or six slaughter houses located near the southwestern portion of the city, within one-half or three-quarters of a mile of the body of its population, which were the private property and under the control of individual butchers, and that the location of said slaughter houses was within one-half mile of the abattoir; that the only proper location for the slaughter houses was and is upon the banks of the Mississippi River at or near where the abattoir is located; that the slaughter houses were so located that the prevailing winds for a large portion of the year blew the stench and noxious gases from the same over the city, endangering the health and comfort of the inhabitants; that no sufficient drainage to carry off the sewage matter therefrom could be constructed and maintained; that the houses were kept and run in a filthy and unwholesome manner, etc., and that many complaints were made, etc.; that hogs were kept and fed on putrid offal, etc., the details of which are set out, showing a disgusting and revolting state of affairs; that unwholesome animals had been slaughtered and sold to the people for food ; all of which is backed up by the resolutions of nine leading physicians of the city, and the report of the Board of Health, recommending the building of a slaughter house or abattoir; that the city

had attempted to regulate the evil by ordinance, by licensing the slaughter houses and regulating them, but the effort had proved a failure on account of want of drainage and water supply, etc. It appears that about the time of the passage of the ordinance in question the butchers, about fifteen in number, removed the slaughtering more than one mile outside the city limits, and all slaughtered at a place known as Dingledines, and that only one licensed establishment remained inside the city limits, known as Gilmore's. It is set up in the answer that the butchers, as soon as they ascertained that the city had entered upon the construction of the slaughter house, removed to Dingledines, outside the jurisdiction of the city, to avoid inspection and regulation of the business by the city; that the officers of the city have no power over the new slaughter house; avers that Dingledines slaughter house was in a filthy and unwholesome condition, making the same complaints against it as were made against the old slaughter houses.

Messrs. WILLIAM McENIRY, City Attorney, W. H. GEST, E. D. SWEENEY and M. M. STURGEON, for appellants.

Messrs. IRA O. WILKINSON, CHAS. DUNHAM and WILLIAM JACKSON, for appellee.

A taxpayer, although injured only in common with all others, may maintain a bill to enjoin the appropriation of money by a municipal corporation for an unlawful purpose, and this, too, without reference to the amount of taxes paid by him. Springfield v. Edwards, 84 Ill. 625; Wright v. Bishop, 88 Ill. 302; Beauchamp v. Board of Supervisors, 45 Ill. 274; Perry v. Kinnear, 42 Ill. 123; Hesing v. Scott, 107 Ill. 600; Colton v. Hanchett, 13 Ill. 615; Smith v. Bangs, 15 Ill. 399; Carter v. Chicago, 57 Ill. 283; Sherlock v. Village of Winnetka, 59 Ill. 389; Chesnutwood v. Hood, 68 Ill. 132. In this country all corporations, whether public or private, derive their power from legislative grant, and they can do no act for which authority is not expressly given by law, or may not be reasonably inferred, as necessary to give effect to the powers

expressly granted. The doctrine of the courts has uniformly been to confine municipal corporations within the limits that a strict construction of the grants of power in their charters assign them; neither the corporation nor its officers can do any act, or make any contract, or incur any liability not authorized thereby. All acts beyond the scope of the powers granted are void, and in all cases of judicial doubt as to whether a municipality has a given power, the doubt is to be resolved against the corporation. To doubt its power is to deny it. 2 Kent, Com. (12th Ed.), 298-299; Cooley's Const., 191-196; 1 Dillon on Mun. Corp. (3d Ed.) Sec. 89; Bank of U. S. v. Dandridge, 12 Wheat. 68; Bank of Augusta v. Earle, 13 Pet. 587; Railroad Co. v. Harris, 12 Wall. 81; Thomas v. Rail-road Co., 101 U. S. 71; Cook County v. McCrea, 93 Ill. 236; People v. Village of Crotty, 93 Ill. 180; City of Champaign v. Harmon, 98 Ill. 491; Schott v. People, 89 Ill. 195; Ill. Conf. Female Col. v. Cooper, 25 Ill. 133. There is no provision in the general incorporation law, under which this city is incorporated, expressly conferring upon the city the power to build or maintain an abattoir. The question involved in this case is of no inconsiderable consequence, for it may concern the inhabitants of almost every city in the State, as well as the City of Rock Island. If Rock Island can tax its inhabitants to build and maintain an abattoir, and the innumerable other buildings it may construct and maintain upon a kindred claim, so may every other city, incorporated under the general law, in like manner tax its inhabitants. Every privilege and power given to a municipality is a right taken from the people, and hence it is that courts, in cases of doubt, deny the power, and decide in favor of the people. This is not partiality, but a just rule of decision. The people are the source of power, and if it does not affirmatively and clearly appear that they have parted with a given power, it must be held that they have it, and hence the doubt is to be resolved against the municipality.

LACEY, J. The appellant raises some preliminary questions as to the right of the appellee, a mere taxpayer, to maintain

the suit. It is insisted that the amount of appellee's tax is so insignificant, it being only 26 cents per annum in addition on account of abattoir expenses, that a court of equity would not notice it; that the appellee is not acting in good faith on his own account, but is proceeding in the interest of the butchers of the City of Rock Island; that a taxpayer can not enjoin the levy and collection of the proposed tax, levied for the purpose of maintaining the abattoir in the manner proposed by the ordinance; that appellee is estopped because he did not object to the building of the abattoir, and paid taxes for that purpose without objection, and that the State only can question the right of the appellant to hold and use the property. We are inclined to hold all these points against the contention of the appellant. In the first place, if this case falls within the rule of law that is announced in Lemont v. Talcott Stone Co., 98 Ill. 98, which holds the doctrine that an injunction will lie to enjoin a tax "where it has been imposed where the law has not authorized it to be levied," or, as in the case of Wright v. Bishop, 88 Ill. 302, where it was held it would lie to restrain the incurring or issuing evidence of an illegal debt, it would make no difference as to the amount of tax the complainant would be liable to pay in case the tax were levied or the debt incurred and collection enforced.

The first inquiry will be as to the nature of the tax sought to be imposed by the appellant and enjoined by this suit.

Was there any law, according to the allegations and conten tions of the bill, under which the tax or debt, whichever it may be termed, sought to be incurred, could be imposed? It was asserted and claimed in the bill, and upon that the judgment of the court was asked, that the ordinance under which the debt was about to be created and the tax levied was wholly illegal and void, and without the power of appellant to pass. If this be so, which must be admitted to raise this point, then the city had no legal authority to maintain the abattoir or to incur any indebtedness on its account. We are therefore of the opinion this case falls within the rule announced in the two cases above cited. There would be in such case no law under which to make this levy or create the

debt. The contention is, it was without the chartered power of appellant to pass the ordinance, and that the creation of the debt was for purposes not warranted, and that the corporate funds were about to be expended for the same unwarranted purpose. See also Hesing v. Scott, 107 Ill. 600. It is not like the case above, where the vacation of a street was sought to be enjoined. The complainant in that case did not allege that such vacation " would impose on him a particle of loss, nor that he has, or will, sustain the slightest injury or inconvenience distinct from the general public."

We also hold that no matter what the appellee's private motives were as to aiding the butchers, he had a right to maintain his action if he showed legal grounds without reference to such motives. Nor do we think an estoppel could be invoked against him, as his *claim* is that the ordinance is illegal, and there is no legal authority to create further indebtedness.

The payment of one tax created and levied without legal authority could not be invoked as an estoppel against the taxpayer who sought to enjoin another wholly illegal debt sought to be created on the same or similar account. Schaffer v. Bonham, 95 Ill. 368. It is not sought in the appellee's bill to interfere with the right of the city to possess and own the abattoir as a property, but the incurring the expense for the alleged illegal use and maintenance of the same as an abattoir, is only objected to. The appellee's counsel take the ground that under the charter, under which appellant is organized, it had no legal power to pass the ordinance in question or to maintain the abattoir. On the other hand the appellant insists that such power existed, and that the ordinance in question is valid and binding. Upon the decision of this question hangs this controversy.

The appellant claims the power to pass the ordinance in question under certain general provisions of the statute, there being no express power granted in the incorporation act of 1872 to regulate slaughter houses within or without the city.

The general provisions of the " General Act for Incorporation of Cities and Villages," in force July 1, 1872, to which

City of Rock Island v. Huesing.

we have been referred, and under which the power is claimed, is as follows: Article 5, Sec. 63. The City Council shall have the following powers:

Clause 53. "To provide for and regulate the inspection of meats, poultry, fish, butter, cheese, lard, vegetables, cotton, tobacco, flour, meal and other provisions."

Clause 76. "To appoint a board of health and prescribe its powers and duties."

Clause 78. "To do all acts and make all regulations which may be necessary or expedient for the promotion of health or the suppression of disease."

Clause 96. "To pass all ordinances, rules, and make all regulations proper or necessary to carry into effect the powers granted to cities or villages, with such fines and penalties as the City Council or Board of Trustees shall deem proper: *provided* no fines or penalties shall exceed $200, and no imprisonment shall exceed six months for one offense."

If the appellant derived no power under the above several provisions, or some of them, it is conceded it had no power.

The ordinance in question, with all the incidental regulations and the abattoir appliances, is essentially an ordinance for inspection of certain fresh meats before they can be sold in the city for food, as a health measure. The statute grants the power to inspect, expressly. The only question as regards this exercise of power is: is the passage of the ordinance in question, and the regulations therein provided for, a reasonable exercise of the express power granted? In order to determine that question we must look to the circumstances of the case as developed by the bill, answer and the evidence. The power to pass the ordinance and establish and maintain the abattoir as a sanitary measure, we will notice hereafter. What were the circumstances? Some time prior to the passage of the ordinance and erection of the abattoir, the city was supplied with fresh meats by about fifteen licensed butchers, all of whom did their slaughtering at some five slaughtering houses located in the city, and those houses were kept in a most filthy condition, occasioned somewhat from the want of drainage, which, on account of their location away

from the river, could not be remedied, and somewhat on account of the carelessness of the butchers and keepers of the slaughter houses. Besides this, some of the butchers were unprincipled enough to sell diseased meat, and meat in such condition that no civilized person would knowingly eat it. The city was of the opinion, after making the effort, that this evil could not be controlled by the ordinary ordinance with only a penalty attached, and determined, as a part of the remedy, to build the abattoir; but while this was being proceeded with, the butchers removed their place of slaughtering the beeves and other animals outside the city limits and more than one mile therefrom, so that the city had no jurisdiction of the slaughter house and could not inspect the animals before killing; could only inspect the meat after it was brought into the city. The ordinance was passed after the butchers had moved their place of butchering outside the city, or in view of the fact that they were about to so move. It was as important for the city to inspect the animals before they were slaughtered as the meat afterward, and that the ordinance provided for. The city already had the building, which it is not disputed it may hold. All that was wanted was some butchering appliances amounting, in cost, to something like $2,585; the inspector would be required at all events. It appears that the abattoir is well located for butchering purposes, and is right on the banks of the Mississippi River, which gives good drainage.

If the animals were compelled to be brought there for inspection, it would not be unreasonable to suppose that the butchers would be willing to have their work done there instead of at Dingledines, which was far outside the city limits. The ordinance did not compel any of the butchering to be done at the abattoir, only the inspection there or at some other licensed slaughtering house in the city, of which there was only one in existence; but we are authorized to suppose that there might have been others if any one had seen proper to establish them. At least no refusal on the part of the city is shown. If this be so, there was no monopoly established by the city, even if the city could establish a monopoly where it

did the work itself, which we need not decide. Where a city has power to regulate certain matters of police within its limits, in carrying out the details of that power it must necessarily have a large discretion, and an ordinance should not be declared void for unreasonableness, unless clearly so in the mind of the court. Eagan v. City of Chicago, 5 Ill. App. 70.

The next question arising is under the general health clause of the statute. Had the city the power to pass the ordinance and maintain the abattoir? It seems that the issue was made and the case tried and decided in the court below as though the abattoir had been established and all the butchering was required to be done there, or that the ordinance, under all the circumstances, had such coercive features in that direction that it amounted to that, and the city was enjoined from passing an ordinance requiring the butchering to be done at the abattoir. That the general health clause is broad enough to authorize the city to regulate the slaughter houses in the city to a reasonable extent, seems not to admit of much doubt. That would seem to be the effect of the reasoning of the court in the case of Tugman v. City of Chicago, 78 Ill. 405. Clause 78 above cited, seems to be residuary in character, intended to cover every case for the general preservation of the health of cities not specifically delegated, and is not controlled by the specific grants of power enumerated in the other sections. What the city may do to preserve health must necessarily be within the sound discretion of the City Council, controlled in the end by the courts and liable to be declared void for palpable abuse.

The City Council had been informed through an investigation of its Board of Health, of certain facts found to exist at the slaughter houses, and through it of the opinion of nine leading physicians of the city, that the public health was being endangered by the condition of things existing at the slaughter houses in the city.

The physicians resolved " that the meat exposed to air rendered poisonous by the septic emanations from the decomposing offal of slaughtered cattle is highly detrimental to those who eat it; that the meat of hogs fattened on any animal mat-

ter, and especially that in a state of decomposition, is unfit for human consumption, and where used will surely breed disease; that the meat from diseased cattle and immature calves is inedible and its exposure for sale a crime against the health of the community."

It was this state of affairs that the appellant was attempting to remedy. What more natural and efficient remedy could be devised than to build an abattoir where all the slaughtering could be done by the city and where the deputy health commissioners could inspect the animals before slaughter, as well as the meat afterward? It is not denied, but admitted by counsel for the appellee, that the Legislature could, by express grant, give the cities in this State the right to maintain an abattoir like this one, but it is insisted that it has not done so and that such power can not be inferred from clause 78 above cited.

It is claimed that under the rule announced in the case of Chicago v. Rumpff, 45 Ill. 91, the city would not have the power to pass the ordinance in question, nor maintain the abattoir for the reason that the ordinance would create a monopoly. Under the general law the city can "do all acts and make all regulations which may be necessary or expedient for the promotion of health and the suppression of disease." In the Chicago charter recited in Chicago v. Rumpff, *supra*, the power was "to direct the location, management, construction of, and to regulate, license, restrain, abate and prohibit, within the city limits  *  *  *  slaughtering establishments  *  *  *  and all establishments and places where any nauseous, offensive or unwholesome business may be carried on." An ordinance was passed under this law, or attempted to be passed, held not good by the court, whereby John Reed & Company, themselves butchers and vendors of meat in the city, were given the exclusive right to have all the slaughtering done, except what was done at the regular packing houses, on their premises, situate on the south half of a certain block. Reed was to do all the butchering for all the other butchers that might request it; no other slaughter houses after certain date were to be allowed in the city under a penalty, except

that the city might allow two more. As a compensation Reed & Company were to have the usual offal and no more. The ordinance, as stated in the opinion of the court, did not declare the business of slaughtering animals in the city a nuisance. The court held the ordinance to be only a contract between the city and Reed & Company.

The court further held that the city was only authorized under the charter to locate, manage and construct, and to regulate, license and restrain, abate or prohibit, within the limits of the city, these establishments; and this must be done by ordinance which in that case was not attempted.

The court also found it illegal to confine the business to one building or to give it to one individual; such a regulation was not contemplated by the act and created a monopoly, and the principle of the equality of rights of corporators was violated. The opinion further states that the city did not proceed on the assumption that the butchering of animals was a nuisance. We think that case is distinguishable from the one at bar in important particulars. In this case the whole object of the ordinance, as is declared in Sec. No. 2, was to secure to the city "good, fresh, wholesome meat." That is, to preserve the health of the city. This was aimed to be accomplished by securing good inspection of the animals and meats, and by keeping a clean slaughter house so that the meats should not become contaminated by contact with impure gases and filth. The health of the people of the city was the main object.

In the Chicago case, as held by the court, there seemed to be no object in view except that of giving Reed & Company a monopoly of the business of slaughtering animals. The ordinance or contract was void as an ordinance for want of being properly passed, or even if passed it would have been void as decided by the Supreme Court. But surely the Supreme Court did not intend to decide that, under a statute like our present broad charter to cities, the Common Council can not maintain an abattoir like the one established by appellant, for the purpose of preserving life and health and of preventing unscrupulous butchers from poisoning the people by selling them diseased and unwholesome meat. The supposed great

damage done the public welfare by the claimed establishing of a monopoly of the butchering business by the City of Rock Island, is the main point relied upon by counsel to establish the unreasonableness of the ordinance. But it seems to us that such considerations must sink into insignificance when we consider the overwhelming benefits to be derived by the same community in the preservation of its health by a clean and wholesome meat supply. The one only touches the pocket, the other the life and health. The slaughtering of the cattle by the city is only an incident necessary to accomplish the more important object of conserving the common health. Individual rights must yield to the public good. Such an ordinance could be no precedent for the establishment of a dangerous monopoly in the future.

The city only charges for the butchering the necessary expense. Any unreasonable charges might make an ordinance void. But under the present ordinance there is no compulsion. This view of the subject has been taken by other courts eminent in ability, and the doctrine announced agrees with our views. The cases referred to are: The City of Milwaukee v. Gross, 21 Wis. 243 ; The New Orleans Slaughter House Cases, 16 Wall. 36. Holding also that the Rumpff case, *supra*, is not in conflict, we feel free to hold that the City of Rock Island has not exceeded its chartered power in passing the ordinance in question and in maintaining the abattoir. Taking this view of the subject, we hold that the court below erred in making the injunction perpetual and decreeing costs against appellant. The decree of the court below is therefore reversed and the cause remanded to that court with instructions to dismiss the bill.

*Reversed and remanded with directions.*