## Teofils Bednarski, Appellee, City of West Hammond, Appellant.

### Gen. No. 18,143.

1. MUNICIPAL CORPORATIONS—*when contract enjoined.* An injunction will be granted restraining the making or carrying out of a contract which increases the indebtedness of the municipality in excess of the constitutional limitation.

2. MUNICIPAL CORPORATIONS—*what indebtedness considered in determining whether constitutional limit of indebtedness exists.* Payments not matured are to be considered in determining whether a municipality is indebted up to its constitutional limit.

3. MUNICIPAL CORPORATIONS—*what considered in determining whether constitutional limit of indebtedness exists.* A sum of money for which the municipality has been adjudicated as liable in special assessment proceedings will be considered in determining whether the constitutional limit of indebtedness has been reached.

4. MUNICIPAL CORPORATIONS—*what indebtedness not considered in determining whether constitutional limit of indebtedness exists.* An indebtedness or evidence thereof will not be considered if there is money in the treasury to meet the same.

5. MUNICIPAL CORPORATIONS—*when bonded indebtedness and warrants do not equal constitutional limit.* Held, upon the showing in this case, that the outstanding bonded indebtedness and warrants of the municipality did not reach in the aggregate the constitutional limit.

6. JUDGMENTS—*how cannot be attacked.* A judgment rendered in special assessment proceedings cannot be collaterally attacked.

7. INJUNCTIONS—*when right of complainant to maintain will not be determined.* Whether a complainant in an action to enjoin a municipal corporation from entering into a contract is a mere dummy will not be determined finally if the showing is not conclusive upon affidavits presented in connection with the motion for a preliminary injunction.

Bill in chancery. Appeal from interlocutory order of Superior Court of Cook county; the HON. RICHARD E. BURKE, Judge, presiding. Heard in this court at the October term, 1911. Affirmed. Opinion filed May 27, 1912.

**Statement by the Court:** This is an appeal from an interlocutory injunction of the Superior Court of Cook County in a suit in chancery brought by one Teofils Bednarski against the City of West Hammond in said Cook County, and its President, Hessler, its Clerk, Mankowski and its Treasurer, Zimmerman.

The bill in the cause alleges that during 1911, prior to August 1st, the government of the Village of West Hammond was legally changed into a city government and the said Village duly erected into a city; that the said Hessler, Mankowski and Zimmerman, who were theretofore the President, Clerk and Treasurer of said Village, respectively, have since exercised and are now exercising the powers and performing the duties of Mayor, City Clerk and City Treasurer; that the Trustees of said Village are likewise exercising the powers and performing the duties of Aldermen of the city; that before the change from the village to the city government the President, Clerk and Trustees caused to be prepared plans, etc., for all that was necessary for the street lighting of West Hammond and the erection of a transmission line from Dalton to West Hammond; that on August 5th, acting as officers of the City of West Hammond, they accepted the bid of the Inter-State Electric Company for said work, in the sum of $18,997, and entered into a contract or are about to enter into a contract with said Inter-State Electric Company for said amount for the doing of the work covered by the said plans and specifications; that

neither the Trustees of the Village nor City Council of the City, during the first quarter of the fiscal year of said Village or City, which commences on May 1st of each year, made such an appropriation as is required by the City and Village Act for the work and materials covered by the said plans and specifications for said electric lighting plant and transmission line, and that no proposition to make an appropriation for such purpose has been sanctioned by a majority of the legal voters of either the City or Village by a petition signed by them, or at a general or special election duly called therefor; that the value of the taxable property within the limits of West Hammond as ascertained by the last assessment for State and County taxes previous to the making of said contract (if said contract has actually been executed) was $643,052; that on August 5, 1911, the complainant is informed and believes, the City of West Hammond was and is indebted in the aggregate in the sum of approximately $41,335, which indebtedness is made up as follows:

Municipal bonds outstanding and unpaid issued
  by the Village of West Hammond in the sum
  of approximately ........................$  6,000
Electric light bonds approximately...........   1,000
Refunding water bonds approximately........   2,000
Pumping station bonds approximately........   2,335
Warrants drawn against the Treasurer of said
  Village and City of West Hammond out-
  standing and unpaid for lack of funds, ap-
  proximately ..............................  12,000
Final judgments outstanding against said Vil-
  lage and City of West Hammond aggregat-
  ing, approximately .......................  18,000

Total approximate indebtedness............$41,335

that the aggregate indebtedness of West Hammond on August 5, 1911, was and is at the time of the filing of the bill, exclusive of the indebtedness contracted for

or contemplated in said contract with said Inter-State Electric Company, more than $8,000 in excess of the amount which said Village or City of West Hammond had or has the right to incur under the provisions of the Constitution of Illinois; that the said officers of West Hammond claim the right to proceed with the contract entered into with said Inter-State Electric Company or about to be entered into with said Company, and pay out the public funds of West Hammond according to the terms of said contract in an aggregate amount of $18,997, all or at least a portion of said payments to be made during the current fiscal year of said City, and that said officers have announced and declared their intention so to do; that said payment will be unlawful, *first,* because no valid appropriation therefor has been made; and, *second,* because such payments will be the liquidation of an indebtedness incurred in excess of the limitation allowed by the constitution of Illinois; that said acts and expenditures would be to the injury of the complainant and all other citizens and taxpayers of West Hammond. The bill therefore prays an injunction against the City and Hessler, Mankowski and Zimmerman, restraining them from signing or executing any contract with said Inter-State Electric Company, its assigns, officers or agents, or, if such contract has already been entered into, from carrying out the provisions thereof, or paying out any of the corporate or other public funds of the City of West Hammond on account thereof, etc.

Teofils Bednarski, the complainant, verified this bill by swearing that the same was true in substance and in fact, except as to the matters therein stated to be upon information and belief, which things he believed to be true.

The bill was filed on August 8, 1911. September 30, 1911, the City of West Hammond, Hessler and Zimmerman filed their joint and several answer to the bill. Their first allegation is that Teofils Bednarski,

although he has, in and for several years last past, been a resident, citizen and taxpayer of the City of West Hammond, only owns in West Hammond the small house in which he lives; that the total value of his said property is not over $1,000, and that he does not pay over $12 per year taxes thereon; that he has no personal interest in this case and is a mere dummy for the Northern Indiana Gas & Electric Company, and that the bringing of the bill was instigated and brought about by the Northern Indiana Gas & Electric Company, and that they have employed and paid the attorneys and solicitors for the complainant herein, and that Teofils Bednarski has no interest whatever in this case except for the Northern Indiana Gas & Electric Company.

The answer then admits the allegations of the bill relating to the changed and existing government of West Hammond and the plans and specifications which were prepared and on which bids were secured on August 5, 1911. It then alleges that said plans and specifications, in addition to providing for lighting West Hammond, include the necessary equipment to furnish power for the sewerage pumping station at West Hammond; that as a part of the system of sewerage and method of cleaning the same, the City of West Hammond has a sewerage pumping station operated by an eight horse power motor, and it has been operating said plant by electricity furnished by the Northern Indiana Gas & Electric Company.

It further alleges, that prior to September, 1908, the Village of West Hammond had been possessed of an electric lighting system plant and operating its own pumping plant in the sewerage pumping station; that it was then proposed to turn over to one Booth the said pumping station and electric lighting system; that at the September Term 1908 of the Circuit Court of Cook County, on a bill in chancery, brought by August Mayer, the Village of West Hammond, its Presi-

dent, Clerk and Board of Trustees were enjoined from doing any act looking to such transfer of use and control and from doing anything to remove or alter the pumps, and from purchasing new pumps and from abandoning, neglecting or refusing to use the electric lighting station and the belongings therein, and from "permitting said Booth, his heirs and assigns to use the poles, wires, arc lamps, street lamps, or other property or belongings of said Village," and from permitting said Booth from erecting any poles or stringing any wires "over which electricity for lighting, heating or power purposes is to be used, conveyed or distributed in any street, alley or public ground in West Hammond;" that the said injunction remains in force, but that thereafter the President, Clerk and Board of Trustees entered into a contract with Booth in regard to furnishing electric current for the City of West Hammond, in violation of the terms of said injunction, and Booth assigned his rights under it to the Northern Indiana Gas & Electric Company; that in violation of the terms of said injunction the exclusive use of the plant of the electric lighting system by the Village of West Hammond was turned over to the Northern Indiana Gas & Electric Company, which since that time had been furnishing electric current to West Hammond, in violation of said injunction; that the Northern Indiana Gas & Electric Company is an Indiana corporation; that it has been furnishing gas and electric light for compensation to private consumers in the State of Illinois and doing a general business in West Hammond, and because never licensed to do business in Illinois is subject to a penalty under the statutes of Illinois.

There are then allegations in the answer that the President of West Hammond in 1909 received a proposal from the Sanitary District of Chicago to furnish electric current for the lighting of West Hammond at a rate which would be a large pecuniary saving to the

Village, and that after the Trustees of the Village had then rejected it, it became a political issue in said Village, and a board of Trustees favorable to the arrangement was elected; that another proposition was made by the Sanitary District, for current to light the streets and operate the sewerage pumping station, which in the aggregate would save the City of West Hammond over four thousand four hundred and fifty dollars yearly, after the original investment was made; that in order to obtain the current from the Sanitary District of Chicago, it would be necessary for West Hammond to construct its own feed line for about five miles from Dalton to West Hammond and to pay a certain charge of the Sanitary District for maintenance on the line from Dalton to the power house of the Sanitary District in Chicago; that it is necessary to install at the present time at least 25 more arc lights in order to properly light West Hammond; that the City owns its poles and wires and all other appurtenances to the street lighting system except the lamps; that at the time the street lighting system was turned over to Booth the Village of West Hammond had a full set of arc lamps for all of the lighting system of said Village, all of which have been replaced by said Booth or the Northern Indiana Gas & Electric Company, his successors.

The answer then admits that August 5, 1911, the officers and trustees acting in behalf of the City of West Hammond accepted the bid for the work covered by the plans and specifications which had been prepared for the electric light and sewerage plants of West Hammond in the sum of $18,997, and entered into a contract with said Inter-State Electric Company for constructing said feed line and fully equipping the electric lighting system and sewerage pumping station of the City of West Hammond for operation by electricity furnished by the Sanitary District of Chicago, but that by said contract they were only to pay the

sum of $2,500 during the current fiscal year, the remainder of the contract price to be paid in treasury warrants or approved bonds of the Village bearing interest at six per cent. and due in one, two, three, four and five years after date.

The answer then asserts that the Board of Trustees did, during the first quarter of the present fiscal year, make an appropriation as required by the City and Village Act of Illinois for cleaning sewers and for general expenses of the Village of West Hammond, from which payment for the work and material called for by said electric lightning plant and transmission line and sewerage plant, which were required to be paid for during the current fiscal year, can be made; that as to the allegations of the bill that the contract and payments in contemplation and sought to be enjoined thereby will be in violation of the constitution of Illinois, because the limit of allowed indebtedness has been already reached, the facts are these: That the assessed taxable property within West Hammond, as ascertained by the last assessment previous to the making of the contract with the Inter-State Electric Company was as charged in the bill $643,052, but that it is not true that on August 5, 1911, and at the present time, the City of West Hammond was and is indebted in the aggregate sum of $41,335; that the total bonded indebtedness of the City of West Hammond is $9,335, made up as follows:

Municipal Bonds ...............................$5,000
Electricity Bonds ............................  500
Refunding Water Bonds......................... 1,500
Pumping Station Bonds......................... 2,335

that there is money in the City Treasury sufficient to pay all outstanding indebtedness for which warrants have been issued; that there are no judgments rendered in any court of record against the Village of West Hammond or the City of West Hammond for

any sum; that the only thing that could be considered in the nature of a judgment is the amount assessed against the City of ·West Hammond for public benefits in some special assessment proceedings, and that these amounts are not due; that the entire indebtedness of the City of West Hammond does not now and will not, after the issuance of the bonds provided for in the contract with the Inter-State Electric Company, exceed the amount allowed by the constitution of the State of Illinois; that therefore the officers of West Hammond desire to proceed with the contract with the Inter-State Electric Company and claim the right to do so.

The defendants further allege that it will cost, under the operations of the Northern Indiana Gas & Electric Company, during the current fiscal year, at least $4,000 to light the City of West Hammond, and at least $1,800 to operate the pumping plant at the sewerage station at West Hammond.

This answer was signed by the City of West Hammond, Hessler and Zimmerman by their solicitors, but was not sworn to.

October 13, 1911, the Chancellor in the Superior Court entered an order that a writ of injunction issue "as prayed in said bill of complaint."

On the hearing, which resulted in this order (from which order this appeal is taken), certain affidavits were presented and read, which appear in the record.

Of these two were the affidavits of Hessler, President of the Village, acting as Mayor of West Hammond; the others were affidavits of Zimmerman, the Treasurer, and Mankowski, the Clerk, respectively. There were also presented and considered and incorporated into the certificate of evidence in the transcript filed in this appeal the certified copy of the contract and specifications between the Inter-State Electric Company and the City of West Hammond, the certified copy of the minutes of the meeting of the

Village Board of West Hammond on July 22, 1911, and the orders of the County Court entered in special assessments Nos. 45 and 46 of West Hammond.

The affidavits of Hessler and Zimmerman practically restated under oath all the allegations of the answer so far as the latter were not conclusions, but recited figures more specifically and added certain other matters pertinent to the controversy. Where material, any difference in form of statement will be mentioned in the opinion following.

FRED H. ATWOOD, FRANK B. PEASE and CHARLES O. LOUCKS, for appellant.

L. L. BOMBERGER and MARVIN E. BARNHART, for appellee.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

The two points made in favor of the issuance of the injunction in this case were:

First, that the action of the defendants in making the contract enjoined was illegal because carrying the indebtedness of the City of West Hammond beyond the constitutional limit; and, second, that it was the incurring of an obligation payable within the fiscal year, for which no appropriation had or could now legally be made by the proper municipal body.

In this appeal the defendants, who are seeking the dissolution of the injunction by the reversal of the order of the Superior Court, deny both these assertions. They say that the debt limit has not been reached and will not be exceeded by the addition of such obligations as the proposed contract will make, and that an appropriation has been made under which expenditures can legally and properly be made to meet said obligations. But they take also another position, which they contend is fatal to the complainant's case.

It involves the right of the complainant to maintain his suit. If that fails, the injunctional order, immediately attacked by the appeal, of course must fall with it. Except for this last contention our decision might well rest on one division or detail of the appellee's argument alone, but as we understand we have been especially requested to express our views on all the matters involved in the cause, for the guidance of a public body and public officers, presumably desirous only of properly executing their trust, we shall discuss them all and not merely the questions on which our final decision must turn.

*First.* The Constitution of Illinois provides, Article 9, Section 12, that:

"No county, city, township, school district or other municipal corporation shall be allowed to become indebted in any manner or for any purpose to an amount including existing indebtedness in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes previous to the incurring of such indebtedness."

It is charged in the bill and is admitted in the answer that the last assessment of the taxable property in West Hammond before the making of the contract involved was $643,052. This makes the constitutional limit of indebtedness $32,152.60.

It is conceded that the making of the contract will be the incurring of a new indebtedness to the amount of $18,997.27. This concession is inevitable in view of the decision in Evans v. Holman, 244 Ill. 602, although the contract provides for successive annual payments instead of a lump sum.

If from the constitutional limit of $32,152.60 we deduct $18,997.27, there is left $13,154.33. The question, therefore, in this branch of the case is whether the City of West Hammond is now indebted to a greater or less amount than $13,154.33. If it is so indebted to

a greater amount, the contract cannot be legally entered into. If it is not, it may be. The complainant in his bill on information and belief alleges that on August 5, 1911, and since, the City was and is indebted in the sum of $41,335. The defendants in their answer deny that the City was and is indebted in that sum, and further make the general allegation that the entire indebtedness of the City "does not now and will not after the issuance of the bonds provided for in the contract with the Inter-State Electric Company exceed the amount allowed by the constitution of the State of Illinois." In their argument, based upon the affidavits and other evidence submitted at the hearing, they assert that this indebtedness is $11,543.28.

A tabulated parallel column statement of the computations of the respective parties will show the items included by the complainant and rejected by the defendant, out of which this difference of almost $30,000 arises.

| Amount of indebtedness as stated by Bill of Complaint. | Amount of indebtedness admitted by the defendants, with notes of their contentions as to items included by the complainant, but denied by them. |
| --- | --- |
| 1. Municipal Bonds outstanding and unpaid issued by the Village of West Hammond in the sum of approximately...$6,000 | 1. Municipal Bonds (as reported on May 3, 1911, by an auditing firm, no bonds having been since issued), ................$5,000 |
| 2. Electric Light Bonds approximately ................$1,000 | 2. Electric Light Bonds (reported as above) ...............$500 |
| 3. Refunding Water Bonds approximately ............$2,000 | 3. Refunding Water Bonds (reported as above), ......$1,500 |
| 4. Pumping Station Bonds approximately ............$2,335 | 4. Pumping Station Bonds.$2,335 |
| Total bonded indebtedness $11,335 | Total bonded indebtedness. .$9,335. |

Up to this point the difference of $2,000 shown is between the statements (admitted to be only approximate computations) of the complainant and the affidavit of the Treasurer of West Hammond. We may properly, therefore, take as proven fact that the bonded indebtedness to be considered amounted to $9,335, in-

stead of the larger sum stated by the complainant. But as to the other items, listed below, there will be seen to be irreconcilable differences in the positions of the parties litigant.

| 5. Warrants drawn against the Treasurer outstanding and unpaid for lack of funds, approximately ...............$12,000 | 5. Warrants drawn against the Treasurer outstanding, which there is not money in the treasury to pay ..........$2,208.28 |
|---|---|

As to this item in which there is a difference of nearly $10,000 between the computations of the parties, much more than sufficient to be decisive as to the illegality of the proposed contract if the position of the complainant is justified, there are several contentions.

It is said by the complainant, first, that there is nothing in the affidavits of Zimmerman and of Hessler (who, on this point, merely says that he has read Zimmerman's affidavit and that it is true) which overcomes the statement of the bill made and sworn to on information and belief, that there were on August 5, 1911, when the contract was made, and August 8, 1911, when the bill was filed, approximately $12,000 of warrants drawn against the Treasurer outstanding unpaid, and which there were no funds to pay.

Treasurer Zimmerman's affidavit shows only the condition on May 1st, 1911, and payments made since that date. On May 1st, 1911, he says there were outstanding warrants on the Treasury amounting to $13,-152.47, and that between May 1st, 1911, and August 17, 1911, (when he made his affidavit) he had paid of these $4,944.19, and on August 17, 1911, had on hand "over $6,000 to meet the same whenever they were presented for payment." *Non constat,* it is said that the situation was not entirely different as to the aggregate amount of the warrants outstanding on May 1st, 1911, or on August 17, 1911, from that on August 5th or August 8th, and different as to the cash on hand to meet them on August 5th or 8th and on August 17th. Therefore the statement of the bill is in no respect

overborne. The argument is plausible but, we do not think, sound.

The bill purports to state the amount very generally and only approximately, and to be wholly on information and belief. It is brought to prevent municipal action within the usual power of its officers, and the right to prevent it should be strictly made out. It appears from one of the affidavits of Hessler that the fiscal year of the municipality begins on May 1st and ends on April 30th. It appears from Zimmerman's affidavit that an audit was made of the accounts of the municipality on May 1, 1911, and by fair inference it appears that for that reason that date was taken as the one on which the exact showing or figures of the outstanding warrants was given. It certainly would have been more satisfactory had a later date been taken to show the figures, but considering the indefinite statement of the bill, and the fact that the affidavits of Zimmerman and Hessler were prepared for and read at the hearing of this application, and as contravening the bill, and that no attempt was made by complainant to contradict their natural import, that they were treating substantially of the situation at the time the impugned contract was made, and considering further that the burden was strictly on the complainant to prove the illegality of the contract, we cannot give the narrow effect to them insisted on by complainant. We regard, therefore, as established, for the purposes of this case, that the outstanding warrants to be considered were at the time of the contract $13,152.47, less $4,944.19—that is $8,208.28,—and that the Treasurer's affidavit imports that he then had $6,000 to meet them.

But the further contention is made by complainant that the possession of this $6,000 did not in any event reduce the amount of indebtedness of the City. The warrants were indebtedness of the City, it is maintained, irrespective of the amount of cash in the treas-

ury.   To this proposition there is cited the opinion
in McDonald v. The City of Chicago, 176 Ill. 404,
but the warrants there mentioned were time warrants,
and the decision does not apply to warrants issued, as
the ones here involved seem to have been, as checks or
orders upon the Municipal Treasury.   In a sense in
common speech they may be called evidences of munic-
ipal indebtedness, but they are not such indebtedness
or evidence of it within the meaning of the constitu-
tional limitation, if there be money in the Treasury
to meet them.   It has been so decided by the Supreme
Court.   Stone v. City of Chicago, 207 Ill. 492.   And
indeed, notwithstanding the contention of complain-
ant in argument, this would seem to be conceded in
his bill, for the warrants listed as a part of the indebt-
edness are said to be "unpaid for lack of funds."

It is, however, further contended that the affidavits
do not show that there is any money in the treasury
available to meet the $8,208.28 warrants admitted by
the affidavits to be outstanding, and indeed that it ap-
pears affirmatively that there was not.   This position
contradicts the express language of the Treasurer's
affidavit, which is that "he now has on hand *to meet
said warrants* that have been issued, over $6,000 when-
ever the same are presented for payment."   The argu-
ment of complainant, however, is that the affidavit must
be taken in connection with Hessler's concerning the
appropriation bill for the fiscal year, beginning May 1,
1911, as meaning only that the Treasury contains that
amount of money, of which only $3,055.81 is available
to meet the warrants, leaving $5,142.47 of indebtedness
on this item, instead of $2,208.28 only, as maintained
by the defendants.   This is material, for while $2,208.28
added to the bonded indebtedness still leaves a margin
of constitutional ability sufficient to include the pro-
posed contract, $5,142.47 so added carries the indebted-
ness beyond the $13,154.33 which we have above noted
as the limit which leaves such a margin.   The computa-

tion of complainant is made as follows: An affidavit of Hessler shows the appropriation for the fiscal year from May 1st, 1911, to April 30, 1912, "for paying unpaid village warrants" to be $8,000. The affidavit of Zimmerman states that since the first day of May, 1911, he has paid on outstanding warrants $4,944.19. Therefore only $3,055.81 of this appropriation or of the City's money remains available to pay on the warrants, and can be "on hand to meet them." The vice of this reasoning seems to us to be that it assumes that the payment of $4,944.19 was made altogether from the appropriation for the fiscal year—1911-12. This does not appear from the affidavits, and no justifiable inference seems to us possible from them to overcome the Treasurer's statement that he has the $6,000 he mentions "on hand to meet said warrants that have been issued whenever the same are presented for payment." The payments, or a portion of them, spoken of may well have been made from the appropriation of the fiscal year 1910-11.

We therefore conclude that the complainant has not shown that by the bonded indebtedness and the warrants the indebtedness has been carried to a point forbidding the contract enjoined.

But complainant insists that it is so carried beyond this point by many thousands of dollars by the sixth item listed in his bill. The contentions as to this item are as follows:

6. Final judgments outstanding against said Village and City of West Hammond, aggregating, approximately .........$18,000

6. Judgments against the said City and Village......*Nothing*

The affidavits presented at the hearing contain on this point only the statement of the Treasurer, Zimmerman, that "he does not know of any judgment that has ever been rendered in any court against the Village of West Hammond or City of West Hammond for any sum whatever, that he is informed and believes

that there are some special assessments for local improvements, in which some portion has been assessed against the Village of West Hammond, but that the same are not due and will not be for a considerable period of time.''

But two orders of the County Court of Cook County entered July 10, 1911, one in special assessment of West Hammond No. 45, and one in special assessment of West Hammond No. 46, were presented as evidence of the judgments alleged. The material matters contained in them are that they recite that the Village of West Hammond, through its Board of Local Improvements has applied for approval of its certificates ''filed in compliance with Section 84, Chapter 24, Revised Statutes of Illinois,'' (by which incorrect description it may be presumed is meant Section 84 of ''An Act concerning Local Improvements, Approved June 14, 1897,'' as amended by Act approved May 14, 1903), for the paving of certain streets and alleys in said village; that objections thereto have come to be heard; that the contractors for the work and the holders of bonds issued by the Village of West Hammond, anticipating the collection of the assessment and the Village of West Hammond and the objectors are before the Court; that the Court finds in each case that if the work ''has'' been constructed as therein provided there would be a rebate coming to each of the property owners of 20 per cent. of the total amount of the assessment made against his property; and that they then decree that the assessment as confirmed to each item of property shall be reduced 20 per cent., and that (it appearing that the first installment of said assessment is in the hands of the collector) the reduction of the total amount of the assessment shall be spread over the installments from the 2nd to the 10th inclusive; that in detail the reductions shall be made as set forth in the order as to the 280 lots named which were assessed; and that (it appearing that some of the

property owners in said assessment have paid all of the said assessments levied against their said property in full) upon exhibition of receipt of any payment on said assessment by any property owner, *the Village authorities of West Hammond shall immediately pay to said property owners 20 per cent. of the amount of the assessment originally confirmed* against the said property, that (it appearing that certain sums were expended by the Board of Local Improvements and the Trustees of the Village of West Hammond, and by the Trustees of the Village of West Hammond in relation to the construction of the local improvement involved and improperly charged against the property assessed in said roll, but that the expenditure of said sums was authorized by the Board of Local Improvements, *and that the Village of West Hammond is liable therefor;) the deficiency of twenty per cent is made a charge against the Village of West Hammond; that said Village is decreed to pay the legal holders of any bonds that have been issued, and, if bonds have not been issued, to the contractor who did the work 20 per cent of the assessment as confirmed, and that judgment be and is entered against the Village of West Hammond in the sum of $8510.65/100 divided into nine yearly installments of $851.85 each in special assessment 45 and of $9036.72/100 divided into nine yearly instalments of $1004.08/100 each in special assessment 46—to meet said deficiency,* and that as modified "the petition of the petitioner, together with cost of improvement" (the certificate of the Board of Local Improvements?) be "approved and confirmed."

There is also in the record an affidavit of Mankowski, the City Clerk, showing that for the Improvement 45 Special assessment bonds and contractors' vouchers had been issued to various persons amounting to $29807.55, and for Improvement 46 similar bonds and vouchers to the amount of $30209.89.

On the face of the record there certainly appears

to be judgment indebtedness against the City of West Hammond to the amount of $17547.37, far more than enough, added to the other admitted indebtedness, to make the contract liability involved in this case illegal and inadmissible.

The defendants, however, maintain that under the authority of Jacksonville Railway Company v. City of Jacksonville, 114 Ill. 562, and of Stone v. City of Chicago, 207 Ill. 492, these judgments, because for public improvement and connected with a special assessment for such improvement, are not to be considered in computing the constitutional limit.

We are unable to assent to this view. Neither of the cases cited is like the present. The implications of the Jacksonville case rather tend against than in favor of the contention, as we think, and in the Stone case no such proceeding or judgment as is involved here existed.

As we construe the judgment orders of the County Court, the situation in West Hammond was this:

Through its Board of Local Improvements it had constructed an improvement under an ordinance, duly passed. A special assessment had been levied and confirmed. Vouchers payable from the first instalment and bonds from subsequent ones had been issued to contractors. The improvement had been completed. Under Section 84 of the "Act concerning Local Improvements," the Board of Local Improvements filed a certificate as required, with the County Court, stating that the said improvement conformed substantially to the requirement of the ordinance, and made "application to the court to determine whether or not the facts stated in said certificate were true." Objections were filed; the Court, under the provision of the Section that it shall "hear and determine the same in a summary manner and enter an order according to the fact," determined that the Village, by its Trustees and Board of Local Improvements had charged in the as-

sessment sums which they had spent, but had no right so to charge; that the Village was liable for those sums either as represented in the bonds or vouchers or otherwise, and that if any property owner had paid his proportion of them to the Village he had a claim for a rebate from it; and a formal judgment was entered against the Village in favor of the bond holders and voucher holders and in favor of any property owner entitled to such a cash rebate.

Whether all this was regular and authorized under Section 84 aforesaid, is not a question before us. Not even a collateral attack is made on these judgments; they are merely alleged not to be evidence of indebtedness under the constitutional provision. But a collateral attack we could not consider here if it were made.

It seems to us that these judgments are even more clearly indebtedness to be considered than was that discussed in The People v. Chicago & Alton Railway Company, 253 Ill. 191 (an opinion handed down by the Supreme Court since this case was argued before us), where the improvement bonds themselves, issued for the construction against the amount due from the municipality and unreduced to any judgment, were held indebtedness under the constitutional provision; the Jacksonville and Stone cases being carefully distinguished in the same sense that the argument of complainant distinguishes them here.

Because of the indebtedness evidenced by these judgments, therefore, we hold that the constitutional limit had been passed by the City of West Hammond before the contract in question was made, and that the making of said contract was illegal.

This holding renders it, as we have before indicated superfluous to discuss the question whether a legal appropriation was made by the legislative body of the municipality in apt time, to which the expenditures under the proposed contract to be made in the fiscal

year 1911-12 could be charged. We will content ourselves, therefore, with saying that we are of opinion there was not.

Neither the appropriation of $2000 "for cleaning and repairing of sewers," nor the general appropriation of $4000 "for expenses not otherwise provided for" seems to us sufficient. Certainly they do not meet the purpose stated in Railway Co. v. The People, 225 Ill. 463, to be the chief one of the statutory provision of Section 2 of Article 7 of the City and Village Act, namely "to apprise the tax payers and all others interested as to what the public funds are to be used for."

Holding, as we do, that the contract enjoined in this case was one clearly without the power of the defendants to make, we should deem it rather unfortunate than otherwise if we were compelled to the conclusion on the record before us that the complainant herein has no standing to maintain this bill. However, while we do not think it necessary to discuss the contention involved at length, we have given it much consideration. The affidavit of John Hessler clearly enough, shows, if it is to be taken as establishing the facts sufficiently for a final decree, a strong motive for an attempt by the Northern Indiana Gas and Electric Company to prevent the performance of the contract sought to be enjoined. It also shows a public saving of a very considerable amount which would come to the municipality of West Hammond by its execution and performance. It shows also a very trifling interest in the taxes of West Hammond and the expenditure of the money of West Hammond on the part of the complainant (a fact which by itself would be no bar to his maintaining his bill), and asserts that *this affiant is informed and believes* that the complainant has no personal interest in this case, and that he is merely a dummy for the Northern Indiana Gas & Electric Company. The affidavit also lends further color to the cor-

rectness of this belief by the included statement that the ''notice of motion for injunction in this case was served upon affiant by John Kamradt, who claims to be assistant manager of the Northern Indiana Gas & Electric Company, that at that time the affiant told said Kamradt that Bednarski would find it difficult to give a bond on an injunction, and that Kamradt told affiant, 'You know the Gas Company can give a bond.' '' The affidavit, if to be taken as establishing the fact for a final adjudication, also shows that the Northern Indiana Gas & Electric Company would not have such ''clean hands'' as would enable it, in pursuance of the motive indicated by the affidavit, even were it itself a tax payer of West Hammond, to maintain this bill in its own name. It seems, as viewed in the light of the allegations of the affidavit we are discussing, to be itself engaged in a contract for lighting the municipality forbidden both to it and to the municipality.

We are not prepared to assent to the sweeping proposition of the complainant that if all this matter urged by the defendants were taken as established, it would be no defense. For this position he relies on the authority of the City of Rock Island v. Huesing, 25 Ill. App. 600. Apart from the consideration that an appellate court decision in another district is for us authority only in a very limited sense, we think that the distinction pointed out by the defendants between their contention and that of the defendants in the Huesing case is well taken. The contention in this case is based on the position that the real mover of the litigation, for which the complainant is but a name, is without standing to maintain this bill; that of the defendants in the Huesing case contained, so far as can be seen, no such element.

We think that as a general proposition it is true that a court of equity can look through shadows to substance and through a party who is a dummy to the real party in interest, and decide whether the real

party can be allowed relief. For this, we think that The People v. The General Electric Company, 172 Ill. 129, and many other well considered cases in various jurisdictions, are authority.

But neither are we prepared to assent to the position that in an appeal from an interlocutory injunction *pendente lite,* on an *ex parte* affidavit made on information and belief as to one material matter, and involving in other respects material matter of record, of which it cannot, by the nature of things, be the best evidence,—we should, by holding untrue the sworn statement of the complainant's bill that he brings the bill in behalf "of himself and all other residents, citzens and taxpayers" of the municipality similarly situated, practically finally decide the litigation on contested questions of fact.

The interlocutory injunction seems to us to have been properly allowed, and the order of the Superior Court is affirmed.

*Affirmed.*