## No. 13,574.

### PETER JOHNSON ET AL. VS. CITY OF NEW ORLEANS.

### SYLLABUS.

1. In so far as the action of a municipal body may be illegal and may result to the prejudice of the tax-payers, any one or more of the latter have the right to implead the city government.

2. But a suit thus instituted by the tax-payers against a municipality must be a *bona fide* proceeding on their part, having the object to assert and protect their individual rights, or those common to all tax-payers.

3. Tax-payers, simply because they are such, have not the right to lend themselves, in a suit of this character, to others who have an interest to subserve, but who prefer to keep in the background. As mere interposed persons they have no right to a standing in court.

4. There is and can be no such thing as an "intervening answer" by a third person in a cause pending between others. Intervention can be only by petition and citation as prescribed by C. P. 393.

5.   An intervenor should ask timely service of his petition and citation upon the plaintiff and defendant, and where an intervention has been filed in ample time for service on the other parties litigant and for expiration of the legal delay for citation prior to calling the case for trial, and there has been no demand for such citation and service and none made, the intervenor has not the right, at the last moment, when the case is called for trial, to obtain time to effect such service. In such case, the trial judge would rule correctly were he to hold that the intervenor, in default of citation and service of his petition, has no standing in the cause, and, ignoring him, proceed to trial.

6.   Municipal discretion over the preparation of ordinances importing grants of franchises will not be interfered with when no improper exercise of municipal power or authority is shown.

7.   The sale of a thing at public auction is not illegal because it happens that one purchaser, without his connivance or procurement, and without fraud, collusion or undue influence being shown, is in a position, by reason of his situation, to bid a price higher than another.

A PPEAL from the Civil District Court, Parish of Orleans—*King, J.*

*Dinkelspiel & Hart* for Plaintiff, Appellee.

*Samuel L. Gilmore,* City Attorney, for Defendant, Appellant.

*Harry H. Hall* for St. Charles Street Railroad Company, Intervenor and Appellant.

The opinion of the court was delivered by

BLANCHARD, J.   Plaintiffs, Peter Johnson and E. J. Dare, appear as citizens and taxpayers of the city of New Orleans, and complain of the official action of the Common Council. In so far as that action may be illegal, and may result to the prejudice of themselves in common with their fellow taxpayers, they have the right to implead the city government. . Handy vs. New Orleans, 39 La. Ann. 108.

But a suit thus instituted by taxpayers against a municipality must be a *bona fide* proceeding on their part, having the object to assert and protect their individual rights, or those common to all the taxpayers, or to vindicate the charter of the corporation against ordinances, or attempts to enact ordinances unauthorized thereby, or in conflict therewith, or which may have been passed, or which the Town Council may seek to pass, in a manner not in compliance with the charter.

Taxpayers, simply because they are such, have no right to lend themselves, in a suit of this character, to others who have an interest to sub-

serve, but who prefer to keep in the background. As mere interposed persons they have no right to a standing in court.

"An action can only be brought by one having a real and actual interest which he pursues."

Code of Practice, 15.

There is that, we think, in the record of this cause which alike justifies and calls for the foregoing observations. But the view we take of the case on its merits renders it unnecessary to pursue the enquiry further.

The petition herein sets forth, among other things, that the St. Charles Street Railway Company owns and operates, under existing franchises, which will not expire by limitation until April 11, 1906, certain street railway lines in the city of New Orleans; that in December 1899, the City Council purported to adopt, and the Mayor to approve, an ordinance whereby the Comptroller of the city was authorized and directed to advertise and sell at public auction an extension for fifty years from April 11, 1906, of the said company's present street-railway rights and franchises, and also the right and franchise to construct, maintain and operate lines of street railway on certain authorized extensions and additions to its existing lines or routes, not only during the fifty years, as above, from April 11, 1906, but also for the years subsequent to the present time and prior to April 11, 1906—the whole to be sold in block; that the total length of the street railways included in this franchise thus advertised for sale aggregates 22.68 miles, of which the lines the said company now owns and operates constitute 11.77 miles, and the proposed extensions and additions 10.91 miles; that the latter have no connection with each other, are of no value except to the person owning and operating the present, existing lines of the said company, and are not capable of being operated as independent lines of street railway; and that the Comptroller had advertised the sale of said franchise to take place March 29, 1900, and will sell the same at that time in block, at auction, unless restrained, to the irreparable injury of the petitioners, who are remediless in the premises, except through the writ of injunction.

The petition then charges, in effect, that the whole proceeding is a scheme to enable the St. Charles Street Railway Company to purchase the franchises offered at a price below their value; that the way in which the offer to sell is made precludes full, fair and free competition, excluding any other than the said company from bidding; that the offer be-

comes a mere bargaining and sale between the city and the car company; that the ordinance authorizing this to be done is unreasonable, illegal and void; that the conditions and obligations attached by the ordinance to the sale of the franchises are in violation of existing statutes; that the necessary preliminaries and proceedings required by law were not sufficiently complied with previous to the adoption of the ordinance; that the ordinance was never legally adopted; and that the same is *ultra vires* and void.

The grounds and details of these various charges of illegality, etc., are set forth at length.

Finally, it is averred that there would be other bidders for said franchises if same were advertised and sold according to law, under valid ordinances, and with opportunity for fair, open and equal competition.

The prayer was for writ of injunction to restrain the sale and for judgment decreeing the ordinances illegal, null and void.

In a supplemental petition subsequently filed it was averred that an amendment to the ordinance, proposed by certain officials of the city, in whom Section 86 of the City Charter vested the authority to amend the same, had not been concurred in by a vote of a majority of the members elected to the Council as shown by the ayes and noes called and recorded, and as required by said Section 86.

The district judge to whom the petitions were presented did not immediately sign the order for injunction, but, instead, directed a rule to issue, requiring defendant city to show cause why a preliminary injunction should not be granted on the showing made.

Hearing was had with the result that the judge discharged the rule and entered an order directing the writ of injunction *pendente lite* to issue.

This was followed by an application by the city to dissolve the injunction as in case of giving a bond to indemnify plaintiffs in whatever injury might result to them by reason of the sale of the franchise rights as advertised under the city ordinance, but averred its exemption by law from furnishing bond in legal proceedings. That is to say, asserting the right to dissolve on bond, but claiming legal exemption from giving the bond itself.

The district judge denied the application to dissolve the injunction on bond, whereupon the defendant city applied to this court for its writ of *mandamus* to compel the granting of the order to bond.

The court, a majority of the judges concurring, granted the *man-*

*damus* (see 52 La. Ann. 1275) and following this the sale of the franchises took place, the St. Charles Street Railway Company becoming the purchaser thereof.

Prior to the trial of the cause upon its merits plaintiffs filed a second supplemental petition averring other grounds of nullity of the proceedings taken for the sale of the franchises.

The defendant city made answer affirming the regularity of all its proceedings, due compliance with all the requirements of law, and the validity of the sale made to the St. Charles Street Railway Company.

The latter corporation intervened to assert and protect its rights and joined the city in its defense of the suit. It did this by a plea called an "intervening answer".

There is and can be no such thing as an "intervening answer" by a third person in a case pending between others. Intervention can be only by petition and citation as prescribed by C. P. 393.

The judge *a quo* ruled properly in holding the document in question to be a petition in intervention which required service upon the plaintiffs and defendant.

He was about to continue the cause in order to have this service made, whereupon counsel for plaintiffs, objecting and with reservation of their rights, accepted service of the intervention.

Subsequently the St. Charles Street Railway Co. filed a formal petition in intervention, concluding with a prayer to be made a party defendant to the suit, and that order was made by the judge.

We consider the Railway Co. merely an intervenor in the suit, "uniting with defendant in resisting the claims of the plaintiff."

Code of Practice, 389.

The court takes occasion, however, to say that an intervenor should ask timely service of his petition and citation upon the plaintiff and defendant, and where an intervention, as in this instance, has been filed in ample time for service on the other parties litigant and for expiration of the legal delay for citation prior to calling the case for trial, and there has been no demand for such citation and service and none made, the intervenor has not the right at the last moment, when the case is called for trial, to obtain time to affect such service. In such case, the trial judge would rule correctly were he to hold that the intervenor, in default of citation and service of his petition, has no standing in the cause, and, ignoring him, proceed to trial.

See Silbernagel vs. Silbernagel, 32 La. Ann. 766.

On the issues as presented there was judgment below in favor of plaintiffs, decreeing the ordinance assailed to be invalid, and annulling the sale of the franchises made to the St. Charles Street Railway Company thereunder.

The city of New Orleans and the Railway Company appeal.

The judge *a quo* rested his decision solely on the ground that the ordinance directing the sale of the franchises had been so framed as to have the practical effect of preventing any one from bidding at the public offering of the franchises other than the St. Charles Street Railway Company, whereas the charter requirement is that street railway franchises must be offered for sale in such way as to be open to free and competitive bidding.

I.

The question first to be considered is, whether or not this ordinance (being Council Series No. 15,809) was adopted by the City Council in the manner and according to the forms prescribed by the City Charter.

We find that this ordinance was first introduced in August 1899 and in due time was considered by the Council. Various amendments were proposed and adopted and on November 28, 1899, the ordinance as thus amended was adopted by a yea and nay vote—the vote standing: Yeas, 26; nays, 0; absent, 2.

This was a compliance with the requirement of Section 17 of the City Charter (Act No. 45 of 1896) which prescribes that no resolution or ordinance (except those relating to investigation and the conduct of parliamentary business) shall have the force of law unless the same receive the votes of a majority of the members elected to the Council, and unless on its final passage the yeas and nays are called and recorded.

Section 86 of the Charter directs that every ordinance granting a franchise, after having been introduced in, considered and passed by the Council in the manner provided for other ordinances, shall be published in full in the official journal for two weeks, and thereafter shall be transmitted to the Mayor, whose duty it shall be to cause the Comptroller, Treasurer, Commissioner of Public Works, Commissioner of Police and Public Buildings and City Engineer to publicly assemble in the council chamber for the purpose of considering and passing upon the ordinance so adopted by the Council.

We find that all this was done in respect to the ordinance under consideration.

It further appears from Section 86 that the officials named, whom we will denominate the "Franchise Committee", are empowered, or any four of them concurring are empowered, to "approve, amend or reject" the ordinance. Then follows this language: "but no such ordinance, resolution or order so amended shall be considered finally passed until any and all amendments shall have been concurred in by vote of a majority of the members elected to the Council, as shown by the ayes and noes called and recorded."

It would thus seem that if the Franchise Committee *reject* the ordinance that is an end of it and the proposition fails. In this, the Franchise Committee have authority over the ordinance in the nature of the veto power.

If the committee *approve* the ordinance as it passed the Council, no further action by the Council is necessary, and the ordinance passes on to the Mayor for his approval.

But if the Franchise Committee *amend* the ordinance, then it must go back to the Council with this amendment or amendments, which must be concurred in by the vote of a majority of the members elected to the Council, as shown by the ayes and noes called and recorded.

In the instant case the Franchise Committee added one provision to the ordinance. That is to say, they reported it back favorably to the Council with one amendment. This amendment was to the effect that all proposing bidders on the franchise as offered at the public sale were to be required to deposit with the Comptroller $2000. In the event of an adjudication under the ordinance the amount deposited by the successful bidder was to be credited on his bid and the other deposits returned to their depositors. The object of this was to provide a fund for paying the expenses incurred in advertising the franchise, etc.

When the ordinance with this amendment was returned to the Council, a *viva voce* vote was taken on the amendment and it was adopted.

Then followed a vote by yeas and nays on the ordinance as thus amended and it was adopted.

All that the Charter required was that the amendment be "concurred in" by a vote taken by ayes and noes in the Council.

This "concurrence" might have been had by simply putting the ordinance *as amended by the Franchise Committee* on its aye and no vote at once. The Franchise Committee had power to add that amendment. It did so. It was not required that there be a separate vote on the

amendment, and then another on the adoption of the ordinance as thus amended.

That would have been the parliamentary situation and requirement had the amendment been proposed *in the Council by some member thereof*. But it was an amendment made to the ordinance by another and a different body vested with power to do so, and all that was thereafter required of the Council was by an aye and no vote to *concur in it*. This might have been done by such vote taken simply on the proposition to concur in the amendment, or by a like vote taken on the proposition to adopt the ordinance *as amended* by the Franchise Committee. By means of either, the concurrence by aye and no vote as demanded by the Charter would be had. The latter of the two courses was resorted to. It sufficed.

But it is contended that the ayes and noes must not only be called but *recorded* as well, and that a mere record kept by roll call of the yeas and nays, as was the case here, does not meet the requirement of the Charter.

The evidence shows that the way it was done in this instance is the way it has been done for years past, under the present and former charters of the city. We cannot say it is not a sufficiently substantial compliance with the direction of the charter in this respect, however much we may be disposed to criticise the method. It were better to call the ayes and noes and *record the same in the minutes* by giving there the names of those who vote "aye" and the names of those who vote "no." And in the publication of the minutes it should so appear, for one of the main purposes of the requirement is to acquaint the public—to give information to constituencies—of how the members of the Council voted.

The further requirement of Section 86 of the Charter is that after an ordinance granting a franchise shall have been thus finally passed, it shall be transmitted to the Mayor for his consideration, and if it meet with his approval he shall sign and publish the same, and it shall have the effect of law.

In this instance the Mayor signed and published the ordinance.

## II.

The next question to be considered is, was the advertisement of the sale of the franchise under the ordinance sufficient in length of time?

Section 87 of the Charter prescribes that no franchise for the opera-

tion of a street railway shall be disposed of "except after three months' publication in the official journal of the terms and specifications of such franchise."

We find that the first advertisement of the proposed sale of the franchise appeared in the official journal on December 28, 1899, and that it continued until the day of the sale, March 29th, 1900.

This was ninety full days without counting the day (December 28th) the advertisement first appeared, nor that (March 29th) on which the sale took place.

But the requirement of the charter is that the advertisement should be for *"three months,"* not ninety days. This means calendar months.

Omitting December 28th, the advertisement ran on the 29th, 30th and 31st of December.

January was one month.

February was one month.

Omitting the 29th of March, the advertisement ran in March 28 days.

Add the three days in December, and we have 31 days, or the greatest number of days in any one calendar month.

### III.

Was this ordinance so framed and was the sale of this franchise so advertised and effected as to render free and open competition impracticable and to preclude other bidders than the St. Charles Street Railway Company?

Section 87 of the Charter provides that after three months' publication of notice thereof the sale of a street railway franchise shall be publicly offered by the Comptroller and adjudicated to the highest bidder. The charter makes reservation, however, of the right of the Council to reject any and all bids, and the ordinance as advertised so stated.

The requirement of the law is that the franchise must be sold to the person or corporation offering the highest percentage of gross annual receipts to be derived from such franchise during the time thereof, first deducting the amount paid each year for taxes.

What the ordinance directed the Comptroller to sell was:—

"The franchise, right of way and right to construct, maintain and operate, and the extension of the present right and franchise to operate and maintain the lines of street railway, with the tracks, curves, switches and other appurtenances as they now exist, and as now owned

by the St. Charles Street R. R. Co. for the term of fifty years from the date of the expiration of· the said company's existing franchise, to-wit: April 11, 1906, and on all the authorized extensions of the route hereinafter provided for, for the unexpired term of said existing franchise in addition to the extension of fifty years above mentioned, over all· the streets and places in the city, hereinafter set forth, upon the following terms, conditions, specifications, and with the following additions of route:"

Then follow the description of the existing lines of the St. Charles Street Ry. Co. and that of the authorized extensions.

The whole is directed to be sold in block, and the object was to add the new lines to the existing route with the view of the extension of that system of street railway more largely over the city. The new lines added to the old system nearly doubled the mileage of the old. One fare only over all the lines—the old and new—was stipulated to be charged.

The construction of the new lines was to begin within ninety days after the signing of the contract and be completed within twelve months thereafter.

Under its existing contract with the St. Charles Street Ry. Co. the city of New Orleans was obligated, at the expiration of the present or old franchise on April 11, 1906, to take at its then value the rolling stock, equipment, depot and fixtures of the company. This obligation the purchaser of the new franchise was required to assume in the city's stead and to pay the price in addition to the regular bid, and to secure the performance of this as well as the other stipulations of the contract, it was required that, as a condition precedent to the receiving of a proposed buyer's bid, he should deposit with the City Treasurer the sum of $50,000—the deposit of unsuccessful bidders to be immediately returned; that of the successful bidder to be retained as security as above stated.

In case the St. Charles Street Railway Company became the purchaser, the city was to be relieved of its obligation to take the property in April 1906—the ownership of that corporation continuing.

Another stipulation was that the purchaser of the franchises should, during the existence thereof, keep in good order and repair, and to pave or repave as required, so much of the streets through which the lines of the railway ran as is comprised between the rails and between the tracks and for one foot on each side of the tracks.

When the franchise terminates on the 11th of April 1956, it is stipulated that the railroad tracks, rolling stock, equipment, etc., should re-

vert to the city of New Orleans upon the payment by it of a valuation to be ascertained in the manner pointed out by the ordinance.

The bidders were required, also, to deposit with the Comptroller the sum of $2000 each. To the unsuccessful bidder this deposit was to be immediately returned; that of the successful bidder was to be retained as a fund out of which should be paid the cost of advertisement and other expenses of the sale. But the amount thereof was to be credited on his bid.

At the sale of the franchise thus offered the St. Charles Street Railway Company proved to be the only bidder and its bid was for five per cent. of the gross annual receipts, less taxes. The franchise was thereupon adjudicated to it and, subsequently, the sale was approved by the Council and the formal contract executed by the Mayor.

The extensions were four in number connecting with the existing St. Charles Street Railway Company's lines at as many points. They have no connection with each other and cannot be operated profitably as independent lines.

Were a purchaser required to construct and operate these extensions, as a whole, as independent lines, there would be no bidders. The same is true if any one of them were offered. It would not pay. Yet they run through parts of the city where there is great want of improved facilities of transportation and great demand for the same.

The only chance to have the lines, represented by the extensions, constructed is by attaching the same to existing profitable lines when the time comes to renew or resell the franchise thereof.

This has been the policy of the city in past years in respect to other extensions on other lines in renewal of the franchises thereof.

While the present charter directs the granting or renewal of street railway franchises to be offered to the highest bidder at public sale, there is nothing in the charter, and nothing intended thereby, prohibiting the City Council from looking after and securing the extension of street car facilities in parts of the city needing the same, by attaching franchises therefor to existing franchises coming up for sale in renewal, and selling the same in block as continuous lines forming a complete system, with one fare over the whole. This is in the interest of the public, in the interest of the development of the city.

The true policy of the city is as much to be found in promoting such extensions as it is in looking after the pecuniary considerations incident to the sale of such franchises.

With regard to the franchise under consideration the situation was this:—

The St. Charles Street Railway Company applied to the city several years in advance of the expiration of its existing franchise (but not longer than was customarily done by railroad companies) for a renewal thereof. It asked only for a renewal as to its existing lines.

At once it was met by a demand for the extensions as finally ordered. Members of the City Council refused to introduce an ordinance looking to the renewal unless the extensions were embodied therein as part of the system.

The people in the sections wanting the extensions took the matter up and by public meetings and petitions made clamorous demand for the same. For months the matter was under consideration.

The railroad company did not want and were not seeking the extensions. It was the City Council representing the people behind its members who made the demand.

By means of the extensions thoroughfares would be opened not only for reaching the homes of the people, their schools and churches, but for the fire engines, police patrol, etc.

By tacking on to a valuable franchise, seeking renewal, the stipulation that the extensions should be constructed and operated as a part thereof, these thoroughfares could be obtained.

We are of the opinion the Council could legally pursue this policy, and while its exercise may have resulted in some advantage to the owners of the old or existing franchise in the matter of bidding at the sale, we do not find that other bidders were shut out from competing. Other persons or corporations could have put themselves in position to have become competitors. The proposed extensions touched, crossed or came in contact with the lines of other street railroad companies.

The advantage to the St. Charles Street Railway Company was not of its seeking or connivance and resulted merely from the situation it occupied as owner of the existing lines to which the extensions were attached. It was not, therefore, an illegal advantage.

No fraud, or collusion, or undue influence is shown, and as far as the city was concerned its rights were protected against the consequences of a bid too low in amount, for its guardians had the right reserved to reject any and all bids.

There was, we think, a sufficient compliance with the requirements of the Charter, in the matter of such sale, to maintain the same.

With regard to the amount of money required to be deposited by bidders, to protect the city and to enforce compliance with the obligations of the contract, the same was within the just discretion of the Council and the court will not interfere therewith.

The same is true with regard to the stipulation that the purchaser of the franchise should be required to keep in good order and repair and to pave and repave when required the portions of streets occupied by the railway tracks, and the other stipulation that a purchaser, other than the owner of the existing franchise, should relieve the city of the obligation it is under to take at its valuation the rolling stock, equipment, fixtures, etc., of the company now operating the existing lines.

We are constrained to differ from our learned brother of the District Court in the conclusion he arrived at, and, for the foregoing reasons, it is ordered, adjudged and decreed that the judgment appealed from be avoided and reversed, and it is now ordered and decreed that the injunction herein sued out be dissolved and the demand of the plaintiffs be rejected at their costs in both courts.