JOHN R. HIGGINS *vs.* THEODORE FRANCIS GREEN *et al.*

JUNE 20, 1936.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker, and Condon, JJ.

CAPOTOSTO, J.   The complainant, John R. Higgins, in his individual capacity as a taxpayer of the city of Woonsocket in this state, brought a bill in equity against certain named respondents "individually and collectively, as members of 'A Board to Purchase Voting Machines,' " appointed under public laws 1935, chapter 2195, and the general treasurer and the secretary of state of this state, to enjoin them from executing a contract for voting machines with the Shoup Voting Machine Corporation, which was also named as a respondent.   The cause was heard by a justice of the superior court on the complainant's prayer for a preliminary injunction.   At the conclusion of this hearing, the trial justice denied the preliminary injunction and, on motion of the attorney general, who appeared for the state, he dismissed the bill and entered a decree to that effect.   The cause is before us on the complainant's appeal from the entry of such decree.

The bill of complaint, in substance, alleges that, pursuant to the provisions of chap. 2195, P. L. 1935, a state board was created for the purpose of purchasing voting machines; that the board has contracted with the Shoup Voting Machine Corporation for the purchase of such machines at a price higher than the bid of the Automatic Voting Machine Corporation; that the machines of the Shoup Corporation have not been approved by the secretary of state as required by law; and that no legal contract may be made for such voting machines until the general assembly, after the referendum provided in the act, takes affirmative action with reference to the issuance of bonds to cover the cost of such machines. No allegation of fraud or bad faith, either directly or by inference, is contained in the bill. The prayer of the bill is for the relief that we have already specified.

The complainant rested upon his sworn bill at the hearing in the superior court. The attorney general, however, called and examined him as a witness. In this examination the complainant, a practicing attorney, testified that he had been retained as counsel by the Automatic Voting Machine Corporation, an unsuccessful bidder, and that he had received a retainer of five hundred dollars from that corporation to bring this suit regardless of whose name was used as a taxpayer. He further testified that if the litigation terminated in his favor he expected a larger fee.

The respondents contend that the superior court was without jurisdiction to enjoin the agencies of the state at the suit of an individual taxpayer. It is well settled in this state that a taxpayer in a municipality may maintain a bill in equity against a municipal corporation to enjoin its officers from abusing its powers in expending money without authority of law. As early as 1872, this court, in *Place* v. *Providence*, 12 R. I. 1, at page 5, says: "The power of a court of chancery to control a municipal corporation in order to prevent any abuse of its powers or any perversion of its funds is too well established to admit of any doubt,

and that the application for its exercise may be made by taxpayers, as well as by the English practice of an information by the Attorney General, is also well supported by authority." See also *Sherman* v. *Carr*, 8 R. I. 431; *Austin* v. *Coggeshall*, 12 R. I. 329; *Murphy* v. *Duffy*, 46 R. I. 210.

The precise question as to whether a taxpayer, acting in his individual capacity, may maintain a suit to enjoin a state agency has not been decided by this court. In other jurisdictions there appears to be a decided conflict on this point. One line of authorities, and probably the greater in number, permit such proceedings. The courts that follow this rule argue, in substance, that upon principle and reason there is no distinction between the right of a taxpayer to maintain a suit to enjoin misapplication of the public funds by a municipality, and the right of such taxpayer to maintain a suit to enjoin an invalid expenditure of public funds by a state agency. *Green* v. *Jones*, 164 Ark. 118; *Leckenby* v. *The Post Co.*, 65 Col. 443; *Fergus* v. *Russel*, 270 Ill. 304; *Christmas* v. *Warfield*, 105 Md. 530; *Castilo* v. *Highway Commission*, 312 Mo. 244; *Page* v. *King*, 285 Pa. 153.

The jurisdictions that take an opposite view distinguish between the relationship of a taxpayer to a municipal corporation and his relationship to the sovereign state. These authorities, upon considerations of public policy, do not permit interference with state agencies by a taxpayer upon a mere showing that he will be affected, along with and in the same way as all other taxpayers, by an alleged improper expenditure of state funds. *B. F. Cummins Co.* v. *Burleson*, 40 App. (D. C.) 500; *Asplund* v. *Hannett*, 31 N. M. 641; *Jones* v. *Reed*, 3 Wash. 57; *Navarro* v. *Post*, 5 Porto Rico (Fed.) 61. There are also a number of jurisdictions where suits by taxpayers against state agencies were instituted but in which the status of the taxpayer as a proper complainant was not specifically questioned and passed upon. *Livermore* v. *Waite*, 102 Cal. 113; *Martin* v. *Lacy*, 39 Kan. 703; *State* v. *State Board of Examiners*, 74

Mont. 1; *Thrailkill* v. *Smith*, 106 Ohio St. 1; *Evanhoff* v. *State Ind. Accident Comm.*, 78 Ore. 503.

We will not express our opinion on this point, for reasons which will presently appear, and pass on to the respondents' contention that, under any view of the law governing the bringing of such a suit by a taxpayer, the complainant in this case is not the real party in interest. Their claim is that the present suit was not instituted in good faith by the complainant to prevent the misapplication of public funds. They point to his uncontradicted testimony and say that, although it was his privilege to accept a retainer as an attorney-at-law from a foreign corporation that was not a taxpayer, he had no right or legal justification to conceal the fact that such corporation was the real party in interest, by bringing a taxpayer's bill in his own name as complainant and thus raise issues which the corporation could not raise in its own right. They, therefore, urge that he is without standing in court, especially in a court of equity.

It is fundamental that equitable remedies in particular are available only to those who have a real interest in the matter litigated and that, upon proper presentation and proof, the court will go behind an ostensible party and decide the issue as if the suit were instituted by the real party in interest. *New Hampshire* v. *Louisiana*, 108 U. S. 76; *United States* v. *Beebe*, 127 U. S. 338; *In re Burdick*, 162 Ill. 48, 52; *People* v. *General Electric Rys. Co.* 172 Ill. 129; *Bell & Howell Co.* v. *Bliss*, 262 Fed. 131; *Nicrosi* v. *Calera Land Co.*, 115 Ala. 429. See also Pomeroy, Eq. Juris., (2d. ed.) 531. This rule evidently applies with equal force in a suit instituted by a taxpayer against a municipality or other governmental agency to assert a right common to all the taxpayers. In such a case he is required to act in good faith and not to lend his name and standing as a taxpayer in furthering the interests of a stranger to the record, who chooses to remain in the background for expediency or legal incapacity. *Johnson* v. *City of New Orleans*, 105 La. 149; *Vadakin* v. *Crilly*, 7 Ohio Cir. Ct., N. S. 341, 344; *Stubbs* v. *City of Aurora*, 160 Ill. App. 351.

The complainant cites a number of cases in support of his contention that a taxpayer is entitled to maintain such a suit irrespective of the motive that influenced him in bringing the suit. A careful reading of the opinions in those cases does not support his claim. In some of the cases the motive was investigated and found to be proper—*Chippewa Bridge Co.* v. *City of Durand,* 99 N. W. (Wis.) 603—in others, motive was held immaterial because the suit was brought under a statute, or the question was improperly raised by the pleadings, or it was injected as a matter not of record, or the impropriety of the real motive was insufficiently proven by the evidence,—*Mazet* v. *City of Pittsburgh,* 137 Pa. 548; *Consumers Co.* v. *City of Chicago,* 313 Ill. 408, 145 N. E. 114; *Gage* v. *City of New York,* 110 App. Div. 403 —and in others, the real party in interest brought the suit in his own name as a taxpayer without subterfuge or concealment. *Times Publishing Co.* v. *City of Everett,* 37 Pac. (Wash.) 695; *Owensboro Waterworks Co.* v. *City of Owensboro,* 96 S. W. (Ky.) 867; *James Shewan & Sons* v. *Mills,* 211 App. Div. 687; *Del Balso Const. Corp.* v. *Gillespie,* 225 App. Div. 42. This question becomes immaterial and so need not be decided by us under our view of these proceedings.

The instant case is one of serious public concern. The main purpose of chap. 2195 is to provide means that would record more truly the will of the people at elections. The people of this state at a special election held on August 6, 1935, through the referendum required by sec. 6 of the act, authorized the issue of state bonds for the purchase of voting machines. With this in mind, we have examined the present bill of complaint and we find that the questions therein raised may be answered upon their merit at this time. Under the particular circumstances of this case, it is in the interest of all concerned that we deal broadly with the substantial questions in issue, for the rights of this complainant are, at best, no greater than the rights of every other taxpayer in the state to have these questions judicially determined.

It, therefore, becomes unnecessary to express any opinion of our own as to the soundness or validity of either of the respondents' contentions that we have already discussed.

We will assume, for the purposes of this case alone and with the clear understanding that we are not so holding, that the complainant is a proper party to bring this suit against the agencies named and that the consent of the state is not necessary. On this assumption we proceed to consider it on its merits. In so doing, we are mindful of the fact that there was no hearing on the merits in the superior court. However, the power of an appellate court to examine into the merits of the cause upon appeal from an interlocutory decree cannot be doubted, especially in a case where such decree not only denies temporary relief, but actually dismisses the suit. If the merits of the cause sufficiently appear in the pleadings and record, this court may, upon deciding that there is no equity in the bill, dismiss the proceedings to prevent needless litigation, inconvenience and expense. It is indeed useless and not the policy of this court to send the complainant back to the superior court to seek relief which must ultimately be denied him. *Smart* v. *Boston Wire Stitcher Co.*, 50 R. I. 409. See also *Smith* v. *Vulcan Iron Works*, 165 U. S. 518; *North Car. R. R.* v. *Story*, 268 U. S. 288.

The complainant fails to make out a case entitling him to equitable relief, even if we take all the averments in the bill as actually proven. The bill first refers to the passage of chap. 2195, P. L. 1935 and then sets out in paragraph three of the bill that sec. 6 of the act authorizes the governor to call a special election for the purpose of submitting to the people for their approval or rejection the following proposition: "State Voting-Machines Loan. Shall the General Assembly be authorized and directed to provide for the issue of State bonds, not to exceed the amount of six hundred thousand dollars, for the purchase by the State of voting machines?" It then goes on to state that in pursuance of such authorization the governor did call a special election

to be held on August 6, 1935, and that at that time "the voters of this state did by their vote authorize and direct the General Assembly to provide for the issue of said bonds not to exceed the amount of Six Hundred Thousand ($600,000) Dollars."

Paragraph four of the bill is as follows: "Your complainant avers that said Section 6 contemplated affirmative action by the General Assembly subsequent to the vote of the people upon the question quoted in Paragraph Third of this bill before any legal bonds could be issued or sold by the State of Rhode Island and Providence Plantations for the purposes mentioned in said Chapter 2195, which said subsequent action by the General Assembly has never been taken, nor has the General Assembly of the State convened or met since the people voted upon said question on, to wit, August 6, 1935; and therefore your complainant avers that no legal contract may be executed by said respondent Committee until such affirmative action by the General Assembly has been taken whereby funds may be provided for such purchase."

Section 1 of the act authorizes the use of voting machines at any state, city or town election; sec. 4 sets out the requirements that such machines must meet; sec. 5 constitutes a board to purchase the machines and describes the manner in which it shall proceed in making the purchase; sec. 6 provides for a referendum to the people for *authority and direction to the general assembly* to issue state bonds not to exceed the amount of $600,000 for the purchase of said machines; sec. 7 authorizes the general treasurer to issue the bonds in a specified manner under the designation of "State voting-machines loan," "whenever the electors of the State shall have approved the issue of bonds" in the amount named; and sec. 9 specifically authorizes and directs the board to purchase the voting machines and appropriates said loan, or so much thereof as may be necessary, to carry out the purpose of the act.

The general assembly is confronted with a constitutional limitation when it comes to pledging the state's credit. The constitution of this state, article IV, sec. 13, provides that: "The general assembly shall have no power hereafter, without the express consent of the people, to incur state debts to an amount exceeding fifty thousand dollars, except in time of war, or in case of insurrection or invasion." The observations of this court in *re State House Construction Loan*, 20 R. I. 704, at 706, are pertinent here. The board to purchase voting machines in this case, as the state house commissioners in the case cited, can only exercise the authority given to it by the general assembly, and the general assembly can only confer such authority as it is authorized to confer by the constitution. The general assembly is competent to purchase voting machines without the express consent of the people, but it has no power to incur a state debt in excess of fifty thousand dollars without such express consent. By enacting chap. 2195, the general assembly first decided as a matter of policy to purchase voting machines and prescribed the method by which such purchase was to be made, and then, complying with the constitutional requirement, asked the people of this state that it be *authorized and directed* to pledge the state's credit by issuing state bonds up to the amount suggested, so that the object of the act might be immediately carried out. Sections 5 and 9 of the act constitute and direct the board therein named to purchase voting machines. Section 7 sets out in detail how the bonds shall be issued and authorizes the general treasurer to issue those bonds up to the amount and for the purpose named, upon the approval by the people of such bond issue. In view of these provisions, no further act by the general assembly itself was necessary to carry out the provisions of said chap. 2195, after the bond issue was approved by the people, as in fact it was.

The second contention of the respondents is that the board created by chap. 2195 is without power to purchase voting machines of any type or make unless such type or

make is first "approved by the secretary of state" and that the machine which the board decided to purchase was not so approved by him. This contention makes it necessary to consider sections 1, 2, 3, 4, 5 and 9 of the act. In view of the public interests involved in this case, especially in the issue of state bonds, we will quote freely from these sections whenever a summary of the pertinent parts seems inadequate.

Section 1 authorizes "The use at any state, city, or town election of voting-machines of such type or make as shall have been examined and approved by the secretary of state."

Section 2 deals with the definition of terms and is, in part, as follows: "In this act, unless the context otherwise requires: The term 'machine,' when used in sections five to twenty-seven, inclusive, of this act, shall mean any voting-machine of a type or make approved by the secretary of state."

Section 3 reads: "Whenever requested by any person representing any type or make of voting-machine which in the opinion of the secretary of state will probably comply with the provisions of this act, the secretary of state shall examine such machine, and if satisfied as to the durability, accuracy, efficiency, and capacity of such machine, and that it does comply with the requirements of this act, he shall approve such type or make of machine, and shall make a certificate of such approval, which certificate, together with the reports, drawings and photographs, shall be a public record, and thereafter such type or make of machine *may be used* upon ratification by purchase by the board hereinafter named as provided in this act. In making such examination the secretary of state may employ mechanical experts

to assist him, and the expense of the services of such experts, not exceeding two hundred dollars, shall be paid, by the person or persons offering such machine for examination, before such examination is had, and such mechanical experts shall sign the certificate of approval made by the secretary of state under this section:  Provided, however, that no type or make of machine shall be *used* at any state or town election until such machine shall have been approved by the secretary of state."   (italics ours)

Section 4 sets out in detail sixteen requirements that the voting machines must meet.   It begins by stating that: "Any type or make of voting-machine approved by the secretary of state must meet the following requirements;" and ends with the statement that: "Any machine that does not conform in all respects to the foregoing requirements shall not be approved by the secretary of state."

Section 5 provides: "A board to purchase voting machines, composed of the following members, the governor, the lieutenant governor, the secretary of state, the state budget director and comptroller, and the chairmen of the senate and house finance committees shall purchase all voting-machines" upon open bidding as prescribed.

This section further provides that: "The board shall be empowered to select the lowest responsible bid, of the machine which fulfills to *its satisfaction* all the requirements heretofore enumerated, and nothing in this act shall be so construed as to exclude any manufacturer of voting-machines from bidding, and the secretary of state shall order their use at any general or special election  .  .  .   and the use of such machines shall be valid for all pur-

poses of the election under the supervision of the secretary of state."

Section 9, in so far as pertinent in this case, is as follows: "The board is hereby authorized and directed to purchase and the secretary of state shall have installed such number of voting-machines as may be required for all voting districts of this state . . . and the sum of six hundred thousand dollars, or so much thereof as may be necessary to carry out the purpose of this act, is hereby appropriated out of the state voting-machines fund. . . ."

Chapter 2195 of P. L. 1935, is a comprehensive act. Its principal object is to provide for the purchase of voting machines that meet certain mechanical requirements, provided the people of this state consented through a referendum to pledge the state's credit for that purpose. The act goes further and, anticipating that the people would consent and that the machines would be purchased, it places such machines under the direct control and supervision of the secretary of state; it authorizes their use at elections, and it specifies the conditions under which they may be used at such times. The act is loosely drawn and frequently commingles separate and distinct matters in the same section. The confusion so created is increased by the incautious use of the word "approved" when employed in connection with the duties imposed by the act upon the secretary of state. But defects of structure or expression cannot impair the validity of an act of the general assembly, especially when affirmed by the people, if its intent and purpose are manifestly clear upon consideration of the entire act.

The complainant's contention that the board has no power to purchase voting machines unless the type or make of such machines is previously "approved by the secretary of state" results in a distortion of the act, which, even

though inartistic, sets out with sufficient clearness the purposes and true intent of the general assembly. The complainant overlooks the fact that the duties of the secretary of state before the purchase of voting machines by the board are entirely different in character from his duties after such purchase, and, further, that the term "approved by the secretary of state" has a different meaning when applied to one or the other of these situations. Before the purchase of voting machines, the duties of the secretary of state are limited and largely ministerial; after such purchase, his duties are extensive and administrative. The meaning of the word "approved" depends upon the context and the nature of the act subject to approval. "To approve" may mean "to show to be worthy of approbation or acceptance" or it may mean "to sanction officially." Webster's New International Dictionary. The term "approved by the secretary of state," as used in chap. 2195, in connection with his duties before the purchase of voting machines by the board, means that in his opinion a type or make of such machine which he has been requested to examine at the expense of a prospective seller meets the requirements of the act, and is, therefore, worthy of acceptance by the board. That same term, applied to his duties after the board has purchased the type or make of voting machine which "fulfills to its satisfaction" the requirements of the act, means that such machines shall be used at elections in the manner described in the act and then only under the direction and supervision of the secretary of state. In this latter instance, the approval required from the secretary of state is, in substance, a certification to the people that the voting machines distributed by him for use at elections are of the type or make sanctioned by the state and that they are in good mechanical order.

Were we to give the words "approved by the secretary of state" the uniform meaning of "sanctioned officially by the secretary of state," and were we to apply such meaning with reference to the power of the board to purchase voting

machines, we would be met with an anomalous situation, which we cannot conceive the general assembly ever contemplated. Under such application of that term, the secretary of state would become the real and final arbiter of the type or make of voting machine that the state should purchase. If, before purchase, he failed or refused to give his approval to a certain type or make of voting machine, which complies with all the requirements of sec. 4, such failure or refusal would divest the board of all power to consider that particular machine. If, on the other hand, he was dissatisfied with the type or make of voting machine that the board, of which he was a member, did in fact purchase, then it would be within his power to nullify the action of the board by refusing to sanction officially the selection which the board had made. Neither of these assumptions are warranted by any provision in the act and both are in direct conflict with its clear intent and purpose. If the general assembly intended to rely upon the independent, individual judgment of the secretary of state, in addition to and as a check upon any action of the board in selecting the type or make of voting machine, so that unless both the board and the secretary of state agreed to purchase the same type or make of such machine no purchase of voting machines could be made at all, the general assembly would have said so in direct and plain language. We can not bring ourselves to believe that the general assembly actually intended to grant to the secretary of state the power to limit, control and veto the power of the board.

A consideration of the act as a whole and of sections 1, 2, 3, 4, 5 and 9 in particular leads us to the following conclusions: (1) By the provisions of secs. 5 and 9 the board thereby created has absolute power to purchase voting machines of a type or make which fulfills to its satisfaction the mechanical requirements specified in sec. 4. (2) The secretary of state is without power to limit or control the board in its choice of the type or make of voting machine that it shall select for purchase. (3) Excepting the specific

instance mentioned in sec. 3, and then only for the limited purpose therein described, the term "approved by the secretary of state" refers to the supervision demanded by the act from the secretary of state over the voting machines that the board shall purchase, especially in respect to their mechanical condition, distribution and use at elections. The term "machine," as defined in sec. 2, is to be so interpreted in connection with the supervisory power vested in the secretary of state over the voting machines that are purchased. (4) The proviso in sec. 3, which is clearly misplaced, is in aid of section 1 and should be read in conjunction with the provisions of this latter section. Both concern solely the use of voting machines at election. (5) Although the general assembly defines the term "machine" in sec. 2, it carefully guards against any misapplication of that term, as defined, by providing at the very beginning of the section that such definition shall apply "unless the context otherwise requires." With the exception noted under (3) above, we find nothing in the act which requires that the term "machine," as defined in sec. 2, be so applied in respect to the selection and purchase of voting machines by the board.

The complainant's final contention is that the board acted beyond its powers when it accepted the bid of the Shoup Voting Machine Corporation rather than the lower bid submitted by the automatic Voting Machine Corporation. In selecting the type and make of voting machine to be purchased and in accepting the bid of the Shoup Corporation, the board was acting under that provision of sec. 5 which empowers the board "to select the lowest responsible bid, of the machine which fulfills *to its satisfaction*" all the requirements of sec. 4.

This provision invests the board with discretion in determining to its satisfaction the lowest responsible bid for a machine that meets the mechanical requirements specified in the act. We are bound to presume that the board acted in good faith, especially since nothing to the contrary is

averred in the bill. *Sherman* v. *Carr*, 8 R. I. 431, 433. The board has the right to exercise its own discretion within the scope of the power conferred upon it by the general assembly. It is not for us to inquire as to the wisdom with which that power is exercised, for under such circumstances the board is amenable only to those who created it.

We are of the opinion that there is no equity in the bill of complaint and that it was properly dismissed. In view of the fact that the complainant is pursuing a remedy which must ultimately be denied him and that in the meanwhile the public interests may be seriously affected, we have, therefore, taken up and considered at this time the questions raised by the bill of complaint.

The appeal of the complainant is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

Moss, J., concurring. I concur in the result reached by the court in the above opinion, but, I am unable to agree with the reasoning on which that result is based by my associates.

The twelfth paragraph of the bill of complaint is as follows:

"Your complainant further avers that the machine which said respondents, acting as a board to purchase voting-machines, voted to purchase, is not of a type or make that has been approved by the secretary of state in accordance with said chapter 2195. And this complainant is informed and believes and therefore avers that neither the secretary of state nor any member of said board to purchase ever saw the machine that said board voted to purchase at the aforesaid price of Eight Hundred Forty-Seven ($847) Dollars prior to the passage of said vote."

The majority of the court have interpreted the act in question as not requiring that the machines purchased by

the board be of a type or make approved by the secretary of state. In this interpretation I am unable to agree with them. They base it upon the following language of sec. 5: "The board shall be empowered to select the lowest responsible bid, of the machine which fulfills to its satisfaction all the requirements heretofore enumerated."

They conclude from this language that the only restriction in the act as to the type or make of voting machines which the board is authorized to buy is that it fulfills to the satisfaction of the board all the requirements enumerated in sec. 4 of the act. This conclusion would be clearly correct, if it were not for other language of the act which to my mind clearly requires the above-quoted language of sec. 5 to be interpreted to the contrary. I shall underline the words which seem to me particularly important in this connection.

Section 1 is as follows: "The use at any state, city, or town election of voting-machines *of such type or make as shall have been examined and approved by the secretary of state* is hereby authorized under the restrictions provided in this act." It does not necessarily follow from this language that no voting-machines of any other type or make can be used in such elections, but it certainly emphasizes the element of approval by the secretary of state of the type or make of such machines. The language above quoted from sec. 5 also requires that any machines to be purchased under the act shall have been approved by the board as satisfying the requirements enumerated in the act.

Section 2 provides as follows: "In this act, unless the context otherwise requires: . . . The term 'machine,' when used in sections five to twenty-seven, inclusive, of this act, shall mean any voting-machine *of a type or make approved by the secretary of state; . . .*" If the above-quoted language from sec. 5 is rewritten in accordance with this definition of the word "machine," it will read as follows: "The board shall be empowered to select the lowest responsible bid, of the voting-machine of a type or

make approved by the secretary of state which fulfills to its satisfaction all the requirements heretofore enumerated."

I can see no inconsistency or ambiguity in this language as thus reworded, and I can find nothing in the context which requires that the term "machine" in the above-quoted language from sec. 5 shall not be construed as meaning "any voting-machine of a type or make approved by the secretary of state." If the term is so construed, the language will require that voting machines purchased by the board shall be of a type or make approved both by the secretary of state and by the board, as satisfying the requirements enumerated in the act.

The secretary of state is one of the five general officers of the state, elected directly by the people, and the supervision of elections and other work in connection with them are committed to his department and constitute one of the most important, if not the most important of the functions of his office. I see nothing incongruous or unreasonable in providing that any type or make of voting machines, to be eligible for purchase by the board, acting in behalf of the state must be approved by concurrent action by him and the board of which he is a member but which can act without a unanimous vote of its members. Indeed it seems to me that no other interpretation of the language above quoted from sec. 5 is consistent with the following language at the end of sec. 3: "Provided, however, that no type or make of machine shall be used at any state or town election until such machine shall have been approved by the secretary of state."

This interpretation also seems to me to be strongly supported by language near the middle of sec. 3, in which, after providing for the approval by the secretary of state of any type or make of voting machines, if requested by a representative of such type or make and if satisfied as to its durability, accuracy, efficiency and capacity and that it complies with the requirements of the act, the act proceeds as follows: "and thereafter such type or make of machine may be used *upon ratification by purchase by the board*

hereinafter named as provided in this act." To me this clearly requires concurrent approval by the secretary of state and the board.

Again, in sec. 4, which sets forth many requirements for voting machines, the introductory paragraph is as follows: "Any type or make of voting-machine *approved by the secretary of state* must meet the following requirements," and the last paragraph is as follows: "Any machine that does not conform in all respects to the foregoing requirements shall not be *approved by the secretary of state*." (italics ours)

To my mind the necessity of approval by the secretary of state of any type or make of machine to be purchased by the board under the act is by far the most prominent feature of the act and I can hardly imagine how its necessity could be made clearer.

As to the meaning of the word "make" in the expression "type or make" which is so frequently used in the act, I find that the first definition of that word in Webster's New International Dictionary is, "a The manner or style in which a thing is composed or constructed; constitution of parts; structure; form. b Nature; character; type; kind." It also may refer to the "quality or origin of a manufactured article." I believe that it is used in the act in question as practically synonymous with "type."

There was not introduced in the superior court any evidence of an approval by the secretary of state of the type or make of the machines purchased by the board, construing the word "make" as above stated, and I cannot find that there is any official record of such an approval of which this court should take judicial notice and which would prove conclusively that there has been such an approval.

To sum up my conclusions on this phase of the case, I find that under the act as properly construed, the board could not validly contract to purchase voting machines of any type or make not approved by the secretary of state; that it is averred in the bill of complaint that the machines

which the board voted to purchase are not of a type or make that has been so approved *by the secretary of state* in accordance with the act; that there was no evidence before the superior court, and there is none before us, to disprove the truth of that averment; and that therefore it must be assumed to be true for the purposes of our decision. From these findings it follows, in my judgment, that the decree appealed from, denying and dismissing the bill of complaint should not be sustained on the ground adopted in the opinion of the court, viz., that there is clearly no merit in the complainant's suit, even if it be assumed that he is a proper party to bring it.

But the justice of the superior court who entered the decree rested his decision on another ground, which was the one urged by the attorney general in support of his motion that the bill be dismissed, and which deserves consideration. This ground is, in substance, that the complainant, in bringing and prosecuting this suit, was not really acting at all in protecting his own interest as a taxpayer to the state, whose taxes might, or even would be increased, but was acting solely as the attorney and in the interest of a corporation which was an unsuccessful bidder for the contract to sell voting machines to the state, and which had no right to prosecute such a suit in its own behalf.

From the testimony given by the complainant himself, especially when considered in the light of the fact that he did not show or even allege that he was a taxpayer to the state or show that the carrying out of the contract attacked would or might be substantially detrimental to him, I believe that the conclusions of fact upon which the decision of the superior court was based were fully justified.

I have made no exhaustive study of the question whether these conclusions justify the dismissal of the bill, and there are authorities on both sides of it, but my opinion now is that upon sound principle and by the weight of authority the question should be answered in the affirmative. The authorities which have had the most weight with me are

*Vadakin* v. *Crilly*, 7 Ohio Cir. Ct., N. S. 341, affirmed on memo. 73 Ohio St. 380; *Stubbs* v. *City of Aurora*, 160 Ill. App. 351, 362; *Bednarski* v. *City of West Hammond*, 170 Ill. App. 543, 564; 2 High on Injunctions, (4th ed.) § 1302.

On this ground I concur in the final result reached in the opinion of the court.

*John R. Higgins, Sidney Silverstein*, for complainant.

*John P. Hartigan, Attorney General, John E. Mullen, 4th Asst. Atty. Gen.*, for respondents.